# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **TO BE FILED UNDER SEAL** |
| v. | : Hon. Michael A. Hammer |
| WILLIAM GREEN | : Mag. No. **19-4154** |
| | : **CRIMINAL COMPLAINT** |

I, Andrew Grammatikos, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Internal Revenue Service, and that this Complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

_____
Andrew Grammatikos, Special Agent
Internal Revenue Service

Sworn to before me, and
subscribed in my presence

February 28, 2019 at
Newark, New Jersey

HONORABLE MICHAEL A. HAMMER
UNITED STATES MAGISTRATE JUDGE            Signature of Judicial Officer

## ATTACHMENT A

## COUNT ONE

### (Prohibition of Unlicensed Money Transmitting Businesses)

From in or around August 2017 through in or around February 2019, in the District of New Jersey and elsewhere, defendant

## WILLIAM GREEN

did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business, in violation of Title 18, United States Code, Sections 1960 and 2.

## ATTACHMENT B

I, Andrew Grammatikos, being first duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the United States Department of Treasury, Internal Revenue Service, Criminal Investigation (IRS-CI) and have served in this capacity since August 2010 with the Newark Field Office. My duties and responsibilities include conducting investigations of violations of Internal Revenue laws, money laundering statutes, and currency reporting requirements. I am empowered by law to conduct investigations of, and to make arrests for, offenses in violation of Title 18 and Title 26 of the United States Code. As part of my training as a Special Agent, I attended the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, for approximately six months. I received training in criminal and financial investigative techniques with an emphasis in accounting and criminal tax law, and graduated from the Criminal Investigator Training Program at FLETC in April of 2011. I have a Bachelor of Science in Accounting from the University of Delaware.

2. Since this Affidavit is submitted for the sole purpose of establishing probable cause to support the issuance of a federal criminal complaint and arrest warrant, I have not included each and every fact known by the Government concerning this investigation. Except as otherwise indicated, the actions, conversations, and statements of others identified in this Affidavit – even where they appear in quotations – are reported in substance and in part. Similarly, dates and times are approximations, and should be read as "on or about," "in or about," or "at or about" the date or time provided.

### PROBABLE CAUSE

I. **Relevant Virtual Currency Industry Terminology**

3. "Virtual currency" is a digital representation of value that can be traded and functions as a medium of exchange; a unit of account; and/or a store of value, but does not have legal tender status in any jurisdiction. Virtual currency generally is not issued or guaranteed by any jurisdiction or government, and its value is decided by consensus within the community of users of the virtual currency.

4. Virtual currency is distinct from "fiat currency," which is the money designated by a country as its legal tender. The U.S. dollar is an example of a fiat currency. Virtual currencies may be traded on online exchanges for fiat currencies, including the U.S. dollar, or used to purchase goods

and services.

5. Bitcoin is a type of virtual currency. Bitcoins are generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin exist primarily as units of an Internet-based form of currency.

6. Bitcoin are sent to and received from bitcoin "addresses." A bitcoin address is analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers. Each bitcoin address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password or pin needed to access the address. Only the holder of the private key to an address can authorize the transfer of bitcoin from that address to other bitcoin addresses.

7. Bitcoin are stored in and used from digital wallets. A digital wallet keeps the private key that allows an individual to transact in bitcoin from an address associated with the wallet. A wallet can be held online—which permits access from any web-enabled device—or on a device, such as a smart phone. A wallet can contain an unlimited number of addresses and enables the user to create new addresses, monitor the amount of bitcoin per address, and authorize transactions using the private key.

8. To transfer bitcoin to another address, the payor transmits a transaction announcement, cryptographically signed with the payor's private key, across the peer-to-peer bitcoin network. The bitcoin address of the receiving party and the sender's private key are the only pieces of information needed to complete the transaction. These two keys by themselves rarely reflect any identifying information. As a result, little-to-no personally identifiable information about the payor or payee is transmitted in a bitcoin transaction.

9. To acquire bitcoin, a typical user will purchase them from a bitcoin "exchanger." Bitcoin exchangers generally accept payments of fiat currency or other convertible virtual currencies. The user typically sends funds to the exchanger, often via cash, bank wire or ACH, for the corresponding quantity of bitcoin, based on a fluctuating exchange rate. The exchanger, usually for a commission, then either sells the user bitcoin from the exchange's reserves or attempts to broker the purchase with another user who is trying to sell bitcoin. The purchased bitcoin are then transferred to the purchaser's Bitcoin address.

II. **Overview of the Destination Bitcoin Scheme**

10. In or around September 2017, a business was registered by William Green ("Green") with the State of New Jersey listing GREEN as the sole

member/manager ("the Business"). The address of the Business is listed as GREEN's home address in Wall, New Jersey.

11. The Business purports to allow Bitcoin investors to purchase Bitcoin in amounts "anyone can afford." A website for the Business indicates it was created with the "average person in mind who wants to purchase and learn about crypto currency." The Business offers the following rates for purchasing Bitcoin: 10% for purchases of less than 50% of one Bitcoin and 5% for purchases over 50% of one Bitcoin.

12. In addition to offering Bitcoin purchasing services, the Business also claims to offer consultation services which include various cryptocurrency investment services such as setting up a Bitcoin Wallet or setting up a payment method by which to purchase Bitcoin. The consultation services range in price from $29.95 to $89.95.

13. The Business' website additionally indicates that the Business accepts payment via credit card. However, investigators learned that GREEN is no longer accepting credit card payments. Instead, bank records show that GREEN is accepting fiat currency via cash payments and wire transfers from various individuals and entities in the United States and an at least one individual in Australia. Shortly after receiving these funds, GREEN converts the fiat currency into Bitcoin for a fee through a Bitcoin Exchange in New York, NY (the "Exchange"). Shortly after purchasing the Bitcoin, GREEN transfers the Bitcoin to multiple different digital Bitcoin wallets. Accordingly, there is reason to believe that GREEN is operating as an unlicensed money transmitter and concealing funds that would otherwise be traceable by law enforcement if deposited at a regulated exchange.

14. A search of NJ Department of Banking and Insurance ("DOBI") databases confirmed that neither GREEN nor the Business are registered as a Licensed Money Service Business in New Jersey.

### III. Banking Information

15. Pursuant to subpoena, law enforcement obtained records from Financial Institution-1 regarding an account held by GREEN (account ending 8588) ("the 8588 Account"). An analysis of those records revealed that between on or about September 1, 2017 and on or about January 23, 2018, the 8588 Account received approximately $1,417,000 in cash deposits and wire transfers from various individuals located in the United States and at least one individual in Queensland, Australia. Shortly after the funds were deposited, GREEN transferred them to an account held at Financial Institution-2 by the Exchange. During this time period, the 8588 Account was used to purchase approximately $2,017,000 in Bitcoin through the Exchange.

4

16. In or around September 2017, GREEN opened a second account at Financial Institution-1 under the name of the Business (account ending 4733) ("the 4733 Account"). Between on or about September 21, 2017 and on or about January 24, 2017, this account received additional deposits of approximately $432,875. Many of the deposits were processed through a payment processor and appear to be related to Bitcoin purchases. Moreover, the majority of the funds received from the payment processor were subsequently transferred to the 8588 account and then used to purchase Bitcoin through the Exchange.

17. Records obtained from Financial Institution-3 revealed that on or about January 16, 2018, GREEN opened an account in the name of the Business (account ending 5335) ("the 5335 Account"). Between on or about January 26, 2018 and on or about March 14, 2018, the 5335 Account received cash deposits and wire transfers totaling approximately $349,000 from various individuals and businesses throughout the United States. This investigation has revealed that two of those wire transfers (a $154,888.23 transfer made on February 15, 2018 and a $74,044.78 transfer made on February 21, 2018) were related to a Business E-mail Compromise ("BEC") scheme.[1] The majority of the funds deposited into the 5335 Account were subsequently transferred to a personal account held by GREEN at Financial Institution-3 (account ending 3970) ("the 3970 Account"). After being transferred to the 3970 Account, the majority of the funds were then used to purchase Bitcoin through the Exchange.

18. Records obtained from the Exchange revealed that GREEN opened an account at the Exchange on or about June 10, 2017. At that time, GREEN stated to the Exchange that he would be using the account to invest extra income in crypto-currency, and claimed that he received this extra income from life insurance, a home equity line of credit, and other businesses. GREEN further indicated to the Exchange that he was a large trader with accounts at multiple exchanges.

19. On or about January 8, 2018, the Exchange sent an email to GREEN stating that a review of GREEN'S account with the exchange showed high transfer activity as well as several large dollar deposits for a personal account. The email requested additional information regarding the source

---

[1] A BEC Scheme is one where bad actors target employees with access to company finances and trick them into making wire transfers to bank accounts thought to belong to trusted partners. Instead, the funds are transferred to accounts controlled by the bad actors or individuals acting on behalf of the bad actors.

of the funds being deposited to GREEN'S account at the Exchange. GREEN responded to the email on or about January 17, 2018. GREEN stated that he is employed by a consulting/sales company called "Tomorrow's Office" and attached a paystub displaying year-to-date earing of $453,266.93 as proof of income. GREEN further stated that he is a "large trader" and that he was trading his own personal funds. GREEN'S account with the Exchange was later closed by the Exchange on or about March 14, 2018 because GREEN did not provide sufficient source of funds.

20. Between on or about September 1, 2017 and on or about March 14, 2018, GREEN deposited approximately $2,531,000 to his account at the Exchange, which was used to purchase Bitcoin. The Bitcoin funds were then transferred to numerous Bitcoin wallets.

### IV. Undercover Purchases of Bitcoin from Green

25. On or about December 6, 2018, a member of law enforcement acting in an undercover capacity ("UC-1") visited the website for Destination Bitcoin and sent an email to destinationbitcoin.com expressing an interest in purchasing Bitcoin. Approximately one hour later, UC-1 received a reply email from GREEN, which stated that UC-1 would receive a phone call at a phone number previously provided by UC-1.

26. On or about December 7, 2018, UC-1 received a phone call from GREEN. UC-1 told GREEN that he/she was interested in purchasing $3,700 in Bitcoin. GREEN told UC-1 that he could fulfill UC-1's order and invited UC-1 to send the money to GREEN via US mail at GREEN'S residence or through wire transfer. GREEN stated that he would take a 5% fee for completing the conversion. GREEN additionally stated that he had been involved with Bitcoin for "several years." GREEN asked UC-1 why he/she needed Bitcoin and UC-1 responded that he/she sells things online, including Viagra.

27. On or about December 10, 2018, UC-1 mailed $3,885 to GREEN'S residence ($3,700 of which was to be converted to Bitcoin and $185 to account for GREEN'S fee). UC-1 then sent a text message to GREEN'S cell phone and provided him with the tracking number for the package.

28. On or about December 12, 2018, UC-1 sent a text message to GREEN stating that GREEN should have received the package. GREEN later responded via text message acknowledging receipt of the package.

29. On or about December 13, 2018, GREEN sent a text message to UC-1 asking for UC-1's Bitcoin wallet. UC-1 provided a Bitcoin wallet to GREEN and GREEN informed UC-1 that he would be sending the Bitcoin in separate transfers. On the same date, GREEN made three separate

transfers of Bitcoin to UC-1's Bitcoin wallet amounting to approximately $3,700.

30. On or about December 20, 2018, UC-1 again sent a text message to GREEN asking him to convert US Dollars to Bitcoin. UC-1 indicated to GREEN that he/she would like to wire the money to Green. Shortly after sending the message to GREEN, GREEN called UC-1 and told UC-1 that he preferred to do the transaction in cash. After UC-1 explained that he/she was operating under a time constraint, GREEN agreed to accept the funds via wire transfer and provided bank account information for UC-1 to wire the funds to. The bank account provided by GREEN belonged to GREEN'S wife. UC-1 subsequently wired approximately $3,600 to GREEN'S wife's account.

31. On or about December 21, 2018, GREEN sent UC-1 a text message asking for his/her Bitcoin wallet address. UC-1 provided an address to GREEN and GREEN later transferred Bitcoin to the address with an approximate value of $3,474.

32. On or about January 11, 2019, UC-1 sent a text message to GREEN asking GREEN to convert $2,700 in cash to Bitcoin. GREEN agreed and instructed UC-1 to send the money to GREEN'S residence.

33. On or about January 16, 2019, GREEN sent a text message to UC-1 indicating that GREEN had received UC-1's package. UC-1 provided GREEN with a Bitcoin address to which GREEN was to send the converted Bitcoin. During the same conversation, UC-1 stated that he/she was expecting to come into some money soon and asked GREEN whether he would be able to convert a larger sum of money (between $11,000 and $15,000). GREEN indicated that he would be able to convert that amount of money to Bitcoin. The next day, on or about January 17, 2019, GREEN transferred approximately $2,700 in Bitcoin to UC-1's wallet.

34. On or about February 4, 2018, UC-1 sent a text message to GREEN stating that he/she wanted to purchase $12,000 worth of Bitcoin. GREEN agreed to do the transaction and UC-1 indicated that he/she would have someone deliver to funds to GREEN in person. UC-1 told GREEN that the person who would be delivering the cash purchases Adderall from UC-1.

35. On or about February 7, 2019, a member of law enforcement acting in an undercover capacity ("UC-2") met GREEN at a location in Wall Township, New Jersey. UC-2 provided GREEN with $12,000 in US currency in a green plastic bag. GREEN counted the money in front of UC-2, confirmed the amount, and left the meeting place with the currency.

36. On or about February 7, 2019, UC-1 sent GREEN a text message and provided him with a Bitcoin wallet to which to send the converted Bitcoin. On or about February 8, 2019, law enforcement received a Bitcoin transfer from GREEN of approximately $10,800 ($12,000 less GREEN'S 10% fee of $1,200).

## CONCLUSION

For the foregoing reasons, there is probable cause to believe that GREEN engaged in the offense of Prohibition of Unlicensed Money Transmitting Businesses, in violation of Title 18, United States Code, Sections 1960 and 2.