ELECTRONICALLY FILED
JARDIM, MEISNER & SUSSER, P.C.
Michael V. Gilberti, Esq., N.J. ID. No. 02301981
30B Vreeland Road, Suite 100
Florham Park, New Jersey 07932
(973) 845-7648
mgilberti@jmslawyers.com
Attorneys for Defendant William Green

<div align="right">

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

</div>

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Criminal No. 19-525 |
| | : | |
| | : | |
| | : | Hon. Kevin McNulty, U.S.D.J. |
| v. | : | |
| | : | |
| | : | |
| **WILLIAM GREEN,** | : | **DECLARATION OF MICHAEL** |
| | : | **V. GILBERTI IN SUPPORT OF** |
| Defendant. | : | **DEFENDANT'S PRETRIAL MOTIONS** |
| | : | |

I, Michael V. Gilberti, hereby declare:

1. I am counsel representing defendant William Green in this case. I have knowledge of the matters set forth in this Declaration and submit it in support of Mr. Green's pretrial motion to dismiss the indictment against him.

2. A true and correct copy of the indictment in this case is attached to and made a part of this Declaration as Exhibit A.

3. On June 24, 2019, the United States Supreme Court issued its opinion in ***United States v. Davis***, 588 U.S.____ (2019). A true and correct copy of the slip opinion is attached to and made a part of this Declaration as Exhibit B.

I hereby declare under penalty of perjury that the foregoing statements are true and correct.

Executed on: November 18, 2019

MICHAEL V. GILBERTI

# EXHIBIT A

RECEIVED

JUL 24 2019

AT 8:30_____M
WILLIAM T WALSH. CLERK

FILED

JUL 24 2019

AT 8:00   1:40   M&s
WILLIAM T. WALSH
CLERK

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. (ES) |
| | : |
| v. | : Crim. No. 19- 525 |
| | : |
| WILLIAM GREEN | : 18 U.S.C. § 1960 |
| | : 18 U.S.C. § 982(a)(1) |

## I N D I C T M E N T

The Grand Jury, in and for the District of New Jersey, sitting at Newark, charges:

### Count One
### (Operating an Unlicensed Money Transmitting Business)

1. At all times relevant to this Indictment:

a. Defendant WILLIAM GREEN was a resident of the State of New Jersey and maintained a website business under the name "Destination Bitcoin." Through the Destination Bitcoin website, defendant GREEN operated a business wherein he received money from members of the public (the "customers"), deposited such money into bank accounts maintained by GREEN, and then converted such money into Bitcoin in accordance with the customers' instructions. Defendant GREEN charged the customers a fee for this service.

b. Federal law provided that "[a]ny person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury...." 31 U.S.C. § 5330(a)(1).

     c.     Defendant GREEN did not register, either in his own name or in the name of his business, with the Secretary of the United States Treasury as a money transmitting business.

     2.     From in or around August 2017 through in or around February 2019, in the District of New Jersey and elsewhere, the defendant,

<div align="center">WILLIAM GREEN</div>

did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business, specifically, a Bitcoin exchange service, which affected interstate and foreign commerce and failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330 and regulations prescribed under that Section.

     In violation of Title 18, United States Code, Section 1960.

## FORFEITURE ALLEGATION

1.      As a result of committing the offense in violation of 18 U.S.C.

§ 1960 alleged in this Indictment, defendant GREEN shall forfeit to the United

States, pursuant to 18 U.S.C. § 982(a)(1), all property, real and personal,

involved in such offense, and all property traceable to such property.

## Substitute Assets Provision

2.      If any of the property described above, as a result of any act or

omission of the defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third
            party;

        c.      has been placed beyond the jurisdiction of the court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be
            divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code,

Section 853(p), as incorporated by Title 18, United States Code, Section

982(b)(1) and Title 28, United States Code, Section 2461(c), to seek forfeiture of

any other property of such defendant up to the value of the forfeitable property

described above.

Grand Jury Foreperson

CRAIG CARPENITO
UNITED STATES ATTORNEY

3

CASE NUMBER: 19- 525 (ES)

## United States District Court
### District of New Jersey

UNITED STATES OF AMERICA

v.

WILLIAM GREEN

## INDICTMENT FOR
18 U.S.C. § 1960
18 U.S.C. § 982(a)(1)



Foreperson

CRAIG CARPENITO
*UNITED STATES ATTORNEY*
*NEWARK, NEW JERSEY*

ANTHONY P. TORNTORE
*ASSISTANT U.S. ATTORNEY*
*973-645-2726*

# EXHIBIT B

(Slip Opinion)         OCTOBER TERM, 2018                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* DAVIS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 18–431.  Argued April 17, 2019—Decided June 24, 2019

Respondents Maurice Davis and Andre Glover were charged with mul-
tiple counts of Hobbs Act robbery and one count of conspiracy to
commit Hobbs Act robbery.  They were also charged under 18 U. S. C.
§924(c), which authorizes heightened criminal penalties for using,
carrying, or possessing a firearm in connection with any federal
"crime of violence or drug trafficking crime." §924(c)(1)(A). "Crime of
violence" is defined in two subparts: the elements clause,
§924(c)(3)(A), and the residual clause, §924(c)(3)(B).  The residual
clause in turn defines a "crime of violence" as a felony "that by its na-
ture, involves a substantial risk that physical force against the per-
son or property of another may be used in the course of committing
the offense." *Ibid.*  A jury convicted the men on most of the underly-
ing charges and on two separate §924(c) charges for brandishing a
firearm in connection with their crimes.  The Fifth Circuit initially
rejected their argument that §924(c)'s residual clause is unconstitu-
tionally vague, but on remand in light of *Sessions* v. *Dimaya,* 584
U. S. ___, the court reversed course and held §924(c)(3)(B) unconsti-
tutional.  It then held that Mr. Davis's and Mr. Glover's convictions
on the §924(c) count charging robbery as the predicate crime of vio-
lence could be sustained under the elements clause, but that the oth-
er count—which charged conspiracy as a predicate crime of vio-
lence—could not be upheld because it depended on the residual
clause.

*Held*: Section 924(c)(3)(B) is unconstitutionally vague. Pp. 4–25.

   (a) In our constitutional order, a vague law is no law at all.  The
vagueness doctrine rests on the twin constitutional pillars of due pro-
cess and separation of powers.  This Court has recently applied the
doctrine in two cases involving statutes that bear more than a pass-

Syllabus

ing resemblance to §924(c)(3)(B)'s residual clause—*Johnson* v. *United States*, 576 U. S. ___, which addressed the residual clause of the Armed Career Criminal Act (ACCA), and *Sessions* v. *Dimaya*, which addressed the residual clause of 18 U. S. C. §16. The residual clause in each case required judges to use a "categorical approach" to determine whether an offense qualified as a violent felony or crime of violence. Judges had to disregard how the defendant actually committed the offense and instead imagine the degree of risk that would attend the idealized "'ordinary case'" of the offense. *Johnson*, 576 U. S., at ___. The Court held in each case that the imposition of criminal punishments cannot be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined "ordinary case." The government and lower courts have long understood §924(c)(3)(B) to require the same categorical approach. Now, the government asks this Court to abandon the traditional categorical approach and hold that the statute commands a case-specific approach that would look at the defendant's actual conduct in the predicate crime. The government's case-specific approach would avoid the vagueness problems that doomed the statutes in *Johnson* and *Dimaya* and would not yield to the same practical and Sixth Amendment complications that a case-specific approach under the ACCA and §16 would, but this approach finds no support in §924(c)'s text, context, and history. Pp. 4–9.

(b) This Court has already read the nearly identical language of §16(b) to mandate a categorical approach. See *Leocal* v. *Ashcroft*, 543 U. S. 1, 7. And what is true of §16(b) seems at least as true of §924(c)(3)(B). The government claims that the singular term "offense" carries the "generic" meaning in connection with the elements clause but a "specific act" meaning in connection with the residual clause, but nothing in §924(c)(3)(B) rebuts the presumption that the single term "offense" bears a consistent meaning. This reading is reinforced by the language of the residual clause itself, which speaks of an offense that, "by its nature," involves a certain type of risk. Pp. 9–12.

(c) The categorical reading is also reinforced by §924(c)(3)(B)'s role in the broader context of the federal criminal code. Dozens of federal statutes use the phrase "crime of violence" to refer to presently charged conduct. Some cross-reference §924(c)(3)'s definition, while others are governed by the virtually identical definition in §16. The choice appears completely random. To hold that §16(b) requires the categorical approach while §924(c)(3)(B) requires the case-specific approach would make a hash of the federal criminal code. Pp. 12–13.

(d) Section 924(c)(3)(B)'s history provides still further evidence that it carries the same categorical-approach command as §16(b). When

Syllabus

Congress enacted the definition of "crime of violence" in §16 in 1984, it also employed the term in numerous places in the Act, including §924(c). The two statutes, thus, were originally designed to be read together. And when Congress added a definition of "crime of violence" to §924(c) in 1986, it copied the definition from §16 without making any material changes to the language of the residual clause, which would have been a bizarre way of suggesting that the two clauses should bear drastically different meanings. Moreover, §924(c) originally prohibited the use of a firearm in connection with *any* federal felony, before Congress narrowed §924(c) in 1984 by limiting its predicate offenses to "crimes of violence." The case-specific reading would go a long way toward nullifying that limitation and restoring the statute's original breadth. Pp. 14–17.

(e) Relying on the canon of constitutional avoidance, the government insists that if the case-specific approach does not represent the best reading of the statute, it is nevertheless the Court's duty to adopt any "fairly possible" reading to save the statute from being unconstitutional. But it is doubtful the canon could play a proper role in this case even if the government's reading were "possible." This Court has sometimes adopted the *narrower* construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly, but it has not invoked the canon to *expand* the reach of a criminal statute in order to save it. To do so would risk offending the very same due process and separation of powers principles on which the vagueness doctrine itself rests and would sit uneasily with the rule of lenity's teaching that ambiguities about a criminal statute's breadth should be resolved in the defendant's favor. Pp. 17–19.

903 F. 3d 483, affirmed in part, vacated in part, and remanded.

GORSUCH, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KAVANAUGH, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined, and in which ROBERTS, C. J., joined as to all but Part II–C.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 18–431

---

## UNITED STATES, PETITIONER *v.* MAURICE LAMONT DAVIS AND ANDRE LEVON GLOVER

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2019]

JUSTICE GORSUCH delivered the opinion of the Court.

In our constitutional order, a vague law is no law at all. Only the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them. Vague laws transgress both of those constitutional requirements. They hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct. When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.

Today we apply these principles to 18 U. S. C. §924(c). That statute threatens long prison sentences for anyone who uses a firearm in connection with certain other federal crimes. But *which* other federal crimes? The statute's residual clause points to those felonies "that by [their] nature, involv[e] a substantial risk that physical force

Opinion of the Court

against the person or property of another may be used in the course of committing the offense." §924(c)(3)(B). Even the government admits that this language, read in the way nearly everyone (including the government) has long understood it, provides no reliable way to determine which offenses qualify as crimes of violence and thus is unconstitutionally vague. So today the government attempts a new and alternative reading designed to save the residual clause. But this reading, it turns out, cannot be squared with the statute's text, context, and history. Were we to adopt it, we would be effectively stepping outside our role as judges and writing a new law rather than applying the one Congress adopted.

## I

After Maurice Davis and Andre Glover committed a string of gas station robberies in Texas, a federal prosecutor charged both men with multiple counts of robbery affecting interstate commerce in violation of the Hobbs Act, 18 U. S. C. §1951(a), and one count of conspiracy to commit Hobbs Act robbery. The prosecutor also charged Mr. Davis with being a felon in possession of a firearm. In the end, a jury acquitted Mr. Davis of one robbery charge and otherwise found the men guilty on all counts. And these convictions, none of which are challenged here, authorized the court to impose prison sentences of up to 70 years for Mr. Davis and up to 100 years for Mr. Glover.

But that was not all. This appeal concerns *additional* charges the government pursued against the men under §924(c). That statute authorizes heightened criminal penalties for using or carrying a firearm "during and in relation to," or possessing a firearm "in furtherance of," any federal "crime of violence or drug trafficking crime." §924(c)(1)(A). The statute proceeds to define the term "crime of violence" in two subparts—the first known as the elements clause, and the second the residual clause.

According to §924(c)(3), a crime of violence is "an offense that is a felony" and

"(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

"(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Violators of §924(c) face a mandatory minimum sentence of five years in prison, over and above any sentence they receive for the underlying crime of violence or drug trafficking crime. The minimum sentence rises to 7 years if the defendant brandishes the firearm and 10 years if he discharges it. Certain types of weapons also trigger enhanced penalties—for example, a defendant who uses a short-barreled shotgun faces a minimum sentence of 10 years. And repeat violations of §924(c) carry a minimum sentence of 25 years.[1]

At trial, the government argued that Mr. Davis and Mr. Glover had each committed two separate §924(c) violations by brandishing a short-barreled shotgun in connection with their crimes. Here, too, the jury agreed. These convictions yielded a mandatory minimum sentence for each man of 35 years, which had to run consecutively to their other sentences. Adding the §924(c) mandatory minimums to its discretionary sentences for their other crimes, the district court ultimately sentenced Mr. Glover to more

---

[1] When this case was tried, a defendant convicted of two §924(c) violations in a single prosecution faced a 25-year minimum for the second violation. See *Deal* v. *United States*, 508 U. S. 129, 132 (1993); §1(a)(1), 112 Stat. 3469. In 2018, Congress changed the law so that, going forward, only a second §924(c) violation committed "after a prior [§924(c)] conviction . . . has become final" will trigger the 25-year minimum. Pub. L. 115–391, §403(a), 132 Stat. 5221.

than 41 years in prison and Mr. Davis to more than 50 years.

On appeal, both defendants argued that §924(c)'s residual clause is unconstitutionally vague. At first, the Fifth Circuit rejected the argument. *United States* v. *Davis*, 677 Fed. Appx. 933, 936 (2017) (*per curiam*). But after we vacated its judgment and remanded for further consideration in light of our decision in *Sessions* v. *Dimaya*, 584 U. S. ___ (2018), striking down a different, almost identically worded statute, the court reversed course and held §924(c)(3)(B) unconstitutional. 903 F. 3d 483, 486 (2018) (*per curiam*). It then held that Mr. Davis's and Mr. Glover's convictions on one of the two §924(c) counts, the one that charged *robbery* as a predicate crime of violence, could be sustained under the elements clause. But it held that the other count, which charged *conspiracy* as a predicate crime of violence, depended on the residual clause; and so it vacated the men's convictions and sentences on that count.

Because the Fifth Circuit's ruling deepened a dispute among the lower courts about the constitutionality of §924(c)'s residual clause, we granted certiorari to resolve the question. 586 U. S. ___ (2018).[2]

## II

Our doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers. See *Dimaya*, 584 U. S., at ___–___ (plurality opinion) (slip op., at 4–5); *id.*, at ___–___

---

[2] Compare *United States* v. *Simms*, 914 F. 3d 229, 236–246 (CA4 2019) (en banc), *United States* v. *Salas*, 889 F. 3d 681, 685–686 (CA10 2018), and *United States* v. *Eshetu*, 898 F. 3d 36, 37–38 (CADC 2018) (holding that §924(c)(3)(B) is vague), with *United States* v. *Douglas*, 907 F. 3d 1, 11–16 (CA1 2018), *Ovalles* v. *United States*, 905 F. 3d 1231, 1240–1252 (CA11 2018) (en banc), and *United States* v. *Barrett*, 903 F. 3d 166, 178–184 (CA2 2018) (taking the opposite view).

Opinion of the Court

(GORSUCH, J., concurring in part and concurring in judgment) (slip op., at 2–9). Vague laws contravene the "first essential of due process of law" that statutes must give people "of common intelligence" fair notice of what the law demands of them. *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926); see *Collins* v. *Kentucky*, 234 U. S. 634, 638 (1914). Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect. Only the people's elected representatives in the legislature are authorized to "make an act a crime." *United States* v. *Hudson*, 7 Cranch 32, 34 (1812). Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide. See *Kolender* v. *Lawson*, 461 U. S. 352, 357–358, and n. 7 (1983); *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89–91 (1921); *United States* v. *Reese*, 92 U. S. 214, 221 (1876).

In recent years, this Court has applied these principles to two statutes that bear more than a passing resemblance to §924(c)(3)(B)'s residual clause. In *Johnson* v. *United States*, 576 U. S. ____ (2015), the Court addressed the residual clause of the Armed Career Criminal Act (ACCA), which defined a "violent felony" to include offenses that presented a "serious potential risk of physical injury to another." §924(e)(2)(B)(ii). The ACCA's residual clause required judges to use a form of what we've called the "categorical approach" to determine whether an offense qualified as a violent felony. Following the categorical approach, judges had to disregard how the defendant actually committed his crime. Instead, they were required to imagine the idealized "'ordinary case'" of the defendant's crime and then guess whether a "'serious potential risk of physical injury to another'" would attend its commission. *Id.*, at ____ (slip op., at 4). *Johnson* held this

Opinion of the Court

judicial inquiry produced "more unpredictability and arbitrariness" when it comes to specifying unlawful conduct than the Constitution allows. *Id.,* at \_\_\_–\_\_\_ (slip op., at 5–6).

Next, in *Sessions* v. *Dimaya,* we considered the residual clause of 18 U. S. C. §16, which defines a "crime of violence" for purposes of many federal statutes.    Like §924(c)(3), §16 contains an elements clause and a residual clause.   The only difference is that §16's elements clause, unlike §924(c)(3)'s elements clause, isn't limited to felonies; but there's no material difference in the language or scope of the statutes' residual clauses.[3]    As with the ACCA, our precedent under §16's residual clause required courts to use the categorical approach to determine whether an offense qualified as a crime of violence.   *Dimaya,* 584 U. S., at \_\_\_–\_\_\_ (slip op., at 2–3); see *Leocal* v. *Ashcroft,* 543 U. S. 1, 7, 10 (2004).   And, again as with the ACCA, we held that §16's residual clause was unconstitutionally vague because it required courts "to picture the kind of conduct that the crime involves in the ordinary case, and to judge whether that abstraction presents some not-well-specified-yet-sufficiently-large degree of risk." *Dimaya,* 584 U. S., at \_\_\_ (slip op., at 11) (internal quotation marks omitted).

What do *Johnson* and *Dimaya* have to say about the statute before us?   Those decisions teach that the imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined "ordinary case."   But does §924(c)(3)(B) require that sort of inquiry?   The government and lower courts

_____

[3] Section 16 provides that the term "crime of violence" means "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

have long thought so. For years, almost everyone understood §924(c)(3)(B) to require exactly the same categorical approach that this Court found problematic in the residual clauses of the ACCA and §16.[4] Today, the government acknowledges that, if this understanding is correct, then §924(c)(3)(B) must be held unconstitutional too.

But the government thinks it has now found a way around the problem. In the aftermath of our decisions holding the residual clauses of the ACCA and §16(b) unconstitutionally vague, the government "abandon[ed] its longstanding position" that §924(c)(3)(B) requires a categorical analysis and began urging lower courts to "adopt a new 'case specific' method" that would look to "the 'defendant's actual conduct' in the predicate offense." 903 F. 3d, at 485. Now, the government tries the same strategy in this Court, asking us to abandon the traditional categorical approach and hold that the statute actually commands the government's new case-specific approach. So, while the consequences in this case may be of constitutional dimension, the real question before us turns out to be one of pure statutory interpretation.

In approaching the parties' dispute over the statute's meaning, we begin by acknowledging that the government

---

[4]See, *e.g.*, *United States* v. *Acosta*, 470 F. 3d 132, 134–135 (CA2 2006); *United States* v. *Butler*, 496 Fed. Appx. 158, 161 (CA3 2012); *United States* v. *Fuertes*, 805 F. 3d 485, 498 (CA4 2015); *United States* v. *Williams*, 343 F. 3d 423, 431 (CA5 2003); *Evans* v. *Zych*, 644 F. 3d 447, 453 (CA6 2011); *United States* v. *Jackson*, 865 F. 3d 946, 952 (CA7 2017), vacated and remanded, 584 U. S. \_\_\_ (2018); *United States* v. *Moore*, 38 F. 3d 977, 979–980 (CA8 1994); *United States* v. *Amparo*, 68 F. 3d 1222, 1225–1226 (CA9 1995); *United States* v. *Munro*, 394 F. 3d 865, 870 (CA10 2005); *United States* v. *McGuire*, 706 F. 3d 1333, 1336–1337 (CA11 2013); *United States* v. *Kennedy*, 133 F. 3d 53, 56 (CADC 1998); see also *Ovalles* v. *United States*, 905 F. 3d 1231, 1295 (CA11 2018) (en banc) (J. Pryor, J., dissenting) ("For years, and even after *Johnson*, the government consistently has urged that we apply a categorical approach to §924(c)").

is right about at least two things. First, a case-specific
approach would avoid the vagueness problems that
doomed the statutes in *Johnson* and *Dimaya*. In those
cases, we recognized that there would be no vagueness
problem with asking a jury to decide whether a defend-
ant's "'real-world conduct'" created a substantial risk of
physical violence. *Dimaya*, 584 U. S., at ___–___ (slip op.,
at 10–11); see *Johnson*, 576 U. S., at ___, ___ (slip op., at 6,
12). Second, a case-specific approach wouldn't yield the
same practical and Sixth Amendment complications under
§924(c) that it would have under the ACCA or §16. Those
other statutes, in at least some of their applications, re-
quired a *judge* to determine whether a defendant's *prior
conviction* was for a "crime of violence" or "violent felony."
In that context, a case-specific approach would have en-
tailed "reconstruct[ing], long after the original conviction,
the conduct underlying that conviction." *Id.*, at ___ (slip
op., at 13). And having a judge, not a jury, make findings
about that underlying conduct would have "raise[d] seri-
ous Sixth Amendment concerns." *Descamps* v. *United
States*, 570 U. S. 254, 269–270 (2013). By contrast, a
§924(c) prosecution focuses on the conduct with which the
defendant is *currently charged*. The government already
has to prove to a jury that the defendant committed all the
acts necessary to punish him for the underlying crime of
violence or drug trafficking crime. So it wouldn't be that
difficult to ask the jury to make an additional finding
about whether the defendant's conduct also created a
substantial risk that force would be used.

But all this just tells us that it might have been a good
idea for Congress to have written a residual clause for
§924(c) using a case-specific approach. It doesn't tell us
whether Congress actually wrote such a clause. To an-
swer *that* question, we need to examine the statute's text,
context, and history. And when we do that, it becomes
clear that the statute simply cannot support the govern-

ment's newly minted case-specific theory.

### III

### A

Right out of the gate, the government faces a challenge. This Court, in a unanimous opinion, has already read the nearly identical language of 18 U. S. C. §16(b) to mandate a categorical approach. And, importantly, the Court did so without so much as mentioning the practical and constitutional concerns described above. Instead, the Court got there based entirely on the text. In *Leocal*, the Court wrote:

> "In determining whether petitioner's conviction falls within the ambit of §16, the statute directs our focus to the 'offense' of conviction. See §16(a) (defining a crime of violence as '*an offense* that has *as an element* the use . . . of physical force against the person or property of another' (emphasis added)); §16(b) (defining the term as '*any other offense* that is a felony and that, *by its nature*, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense' (emphasis added)). This language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." 543 U. S., at 7.

*Leocal* went on to suggest that burglary would always be a crime of violence under §16(b) "because burglary, *by its nature*, involves a substantial risk that the burglar will use force against a victim in completing the crime," regardless of how any *particular* burglar might act on a specific occasion. *Id.*, at 10 (emphasis added); see also *Dimaya*, 584 U. S., at ___ (slip op., at 14) (plurality opinion) (reaffirming that "§16(b)'s text . . . demands a categorical approach"). And what was true of §16(b) seems to us

Opinion of the Court

at least as true of §924(c)(3)(B): It's not even close; the
statutory text commands the categorical approach.

Consider the word "offense." It's true that "in ordinary
speech," this word can carry at least two possible mean-
ings. It can refer to "a generic crime, say, the crime of
fraud or theft in general," or it can refer to "the specific
acts in which an offender engaged on a specific occasion."
*Nijhawan* v. *Holder*, 557 U. S. 29, 33–34 (2009). But the
word "offense" appears just once in §924(c)(3), in the stat-
ute's prefatory language. And everyone agrees that, in
connection with the elements clause, the term "offense"
carries the first, "generic" meaning. Cf. *id.*, at 36 (similar
language of the ACCA's elements clause "refers directly to
generic crimes"). So reading this statute most naturally,
we would expect "offense" to retain that same meaning in
connection with the residual clause. After all, "[i]n all but
the most unusual situations, a single use of a statutory
phrase must have a fixed meaning." *Cochise Consultancy,
Inc.* v. *United States ex rel. Hunt*, 587 U. S. ___, ___ (2019)
(slip op., at 5).

To prevail, the government admits it must persuade us
that the singular term "offense" bears a split personality
in §924(c), carrying the "generic" meaning in connection
with the elements clause but then taking on the "specific
act" meaning in connection with the residual clause. And,
the government suggests, this isn't quite as implausible as
it may sound; sometimes the term "offense" *can* carry both
meanings simultaneously. To illustrate its point, the
government posits a statute defining a "youthful gun
crime" as "an offense that has as an element the use of a
gun and is committed by someone under the age of 21."
Tr. of Oral Arg. 16. This statute, the government sug-
gests, would leave us little choice but to understand the
single word "offense" as encompassing both the generic
crime and the manner of its commission on a specific
occasion. To which we say: Fair enough. It's *possible* for

Opinion of the Court

surrounding text to make clear that "offense" carries a double meaning. But absent evidence to the contrary, we presume the term is being used consistently. And nothing in §924(c)(3)(B) comes close to rebutting that presumption.

Just the opposite. The language of the residual clause itself reinforces the conclusion that the term "offense" carries the same "generic" meaning throughout the statute. Section 924(c)(3)(B), just like §16(b), speaks of an offense that, "by its nature," involves a certain type of risk. And that would be an exceedingly strange way of referring to the circumstances of a specific offender's conduct. As both sides agree, the "nature" of a thing typically denotes its "'normal and characteristic quality,'" *Dimaya*, 584 U. S., at ___ (slip op., at 14) (quoting Webster's Third New International Dictionary 1507 (2002)), or its "'basic or inherent features,'" *United States* v. *Barrett*, 903 F. 3d 166, 182 (CA2 2018) (quoting Oxford Dictionary of English 1183 (A. Stevenson ed., 3d ed. 2010)). So in plain English, when we speak of the nature of an offense, we're talking about "what an offense normally—or, as we have repeatedly said, 'ordinarily'—entails, not what happened to occur on one occasion." *Dimaya*, 584 U. S., at ___ (slip op., at 14); see *Leocal*, 543 U. S., at 7 (contrasting the "nature of the offense" with "the particular facts [of] petitioner's crime").[5]

Once again, the government asks us to overlook this obvious reading of the text in favor of a strained one. It suggests that the statute might be referring to the "na-

---

[5]The government's own regulations reflect this understanding of the ordinary meaning of "by its nature." A Department of Justice regulation provides that an inmate is not eligible for early release if he was convicted of an offense "that, by its nature *or conduct,* presents a serious potential risk of physical force." 28 CFR §550.55(b)(5)(iii) (2017) (emphasis added); see *Bush* v. *Pitzer*, 133 F. 3d 455, 458 (CA7 1997) (denying early release because "[c]onspiracy does not by its 'nature' present a serious risk; but Bush's 'conduct' did so").

ture" of the defendant's conduct on a particular occasion. But while this reading may be linguistically feasible, we struggle to see why, if it had intended this meaning, Congress would have used the phrase "by its nature" at all. The government suggests that "by its nature" keeps the focus on the offender's *conduct* and excludes evidence about his *personality*, such as whether he has violent tendencies. But even without the words "by its nature," nothing in the statute remotely suggests that courts are allowed to consider character evidence—a type of evidence usually off-limits during the guilt phase of a criminal trial. Cf. Fed. Rule Evid. 404.

## B

Things become clearer yet when we consider §924(c)(3)(B)'s role in the broader context of the federal criminal code. As we've explained, the language of §924(c)(3)(B) is almost identical to the language of §16(b), which this Court has read to mandate a categorical approach. And we normally presume that the same language in related statutes carries a consistent meaning. See, *e.g.*, *Sullivan* v. *Stroop*, 496 U. S. 478, 484 (1990).

This case perfectly illustrates why we do that. There are dozens of federal statutes that use the phrase "crime of violence" to refer to presently charged conduct rather than a past conviction. Some of those statutes cross-reference the definition of "crime of violence" in §924(c)(3), while others are governed by the virtually identical definition in §16. The choice appears completely random. Reading the similar language in §924(c)(3)(B) and §16(b) similarly yields sensibly congruent applications across all these other statutes. But if we accepted the government's invitation to reinterpret §924(c)(3)(B) as alone endorsing a case-specific approach, we would produce a series of seemingly inexplicable results.

Take just a few examples. If the government were right,

Opinion of the Court

Congress would have mandated the case-specific approach in a prosecution for providing explosives to facilitate a crime of violence, 18 U. S. C. §844(*o*), but the (now-invalidated) categorical approach in a prosecution for providing *information about* explosives to facilitate a crime of violence, §842(p)(2). It would have mandated the case-specific approach in a prosecution for using false identification documents in connection with a crime of violence, §1028(b)(3)(B), but the categorical approach in a prosecution for using confidential phone records in connection with a crime of violence, §1039(e)(1). It would have mandated the case-specific approach in a prosecution for giving someone a firearm to use in a crime of violence, §924(h), but the categorical approach in a prosecution for giving a minor a handgun to use in a crime of violence, §924(a)(6)(B)(ii). It would have mandated the case-specific approach in a prosecution for traveling to another State to acquire a firearm for use in a crime of violence, §924(g), but the categorical approach in a prosecution for traveling to another State to *commit* a crime of violence, §1952(a)(2). And it would have mandated the case-specific approach in a prosecution for carrying armor-piercing ammunition in connection with a crime of violence, §924(c)(5), but the categorical approach in a prosecution for carrying a firearm while "in possession of armor piercing ammunition capable of being fired in that firearm" in connection with a crime of violence, §929(a)(1).

There would be no rhyme or reason to any of this. Nor does the government offer any plausible account why Congress would have wanted courts to take such dramatically different approaches to classifying offenses as crimes of violence in these various provisions. To hold, as the government urges, that §16(b) requires the categorical approach while §924(c)(3)(B) requires the case-specific approach would make a hash of the federal criminal code.

## C

Section 924(c)(3)(B)'s history provides still further evidence that it carries the same categorical-approach command as §16(b). It's no accident that the language of the two laws is almost exactly the same. The statutory term "crime of violence" traces its origins to the Comprehensive Crime Control Act of 1984. There, Congress enacted the definition of "crime of violence" in §16. §1001(a), 98 Stat. 2136. It also "employed the term 'crime of violence' in numerous places in the Act," *Leocal*, 543 U. S., at 6, including in §924(c). §1005(a), 98 Stat. 2138. At that time, Congress didn't provide a separate definition of "crime of violence" in §924(c) but relied on §16's general definition. The two statutes, thus, were originally designed to be read together.

Admittedly, things changed a bit over time. Eventually, Congress expanded §924(c)'s predicate offenses to include drug trafficking crimes as well as crimes of violence. §§104(a)(2)(B)–(C), 100 Stat. 457. When it did so, Congress added a subsection-specific definition of "drug trafficking crime" in §924(c)(2)—and, perhaps thinking that both terms should be defined in the same place, it also added a subsection-specific definition of "crime of violence" in §924(c)(3). §104(a)(2)(F), *id.*, at 457. But even then, Congress didn't write a new definition of that term. Instead, it copied and pasted the definition from §16 without making any material changes to the language of the residual clause. The government suggests that, in doing so, Congress "intentionally separated" and "decoupled" the two definitions. Brief for United States 34, 37. But importing the residual clause from §16 into §924(c)(3) almost word for word would have been a bizarre way of suggesting that the two clauses should bear drastically different meanings. Usually when statutory language "'is obviously transplanted from . . . other legislation,'" we have reason to think "'it brings the old soil with it.'" *Sekhar* v. *United*

*States*, 570 U. S. 729, 733 (2013).

What's more, when Congress copied §16(b)'s language into §924(c) in 1986, it proceeded on the premise that the language *required* a categorical approach. By then courts had, as the government puts it, "beg[u]n to settle" on the view that §16(b) demanded a categorical analysis. Brief for United States 36–37. Of particular significance, the Second Circuit, along with a number of district courts, had relied on the categorical approach to hold that selling drugs could *never* qualify as a crime of violence because "[w]hile the traffic in drugs is often accompanied by violence," it can also be carried out through consensual sales and thus "does not *by its nature* involve substantial risk that physical violence will be used." *United States* v. *Diaz*, 778 F. 2d 86, 88 (1985). Congress moved quickly to abrogate those decisions. But, notably, it didn't do so by directing a case-specific approach or changing the language courts had read to require the categorical approach. Instead, it accepted the categorical approach as given and simply declared that certain drug trafficking crimes automatically trigger §924 penalties, regardless of the risk of violence that attends them. §§104(a)(2)(B)–(C), 100 Stat. 457.

The government's reply to this development misses the mark. The government argues that §16(b) had not acquired such a well-settled judicial construction by 1986 that the reenactment of its language in §924(c)(3)(B) should be presumed to have incorporated the same construction. We agree. See *Jerman* v. *Carlisle, McNellie, Rini, Kramer & Ulrich, L. P. A.*, 559 U. S. 573, 590 (2010) (interpretations of three courts of appeals "may not have 'settled' the meaning" of a statute for purposes of the reenactment canon). But Congress in 1986 did more than just reenact language that a handful of courts had interpreted to require the categorical approach. It amended §924(c) specifically to abrogate the *results* of those deci-

sions, without making any attempt to overturn the categorical *reading* on which they were based. And *that* would have been an odd way of proceeding if Congress had thought the categorical reading erroneous.

There's yet one further and distinct way in which §924(c)'s history undermines the government's case-specific reading of the residual clause. As originally enacted in 1968, §924(c) prohibited the use of a firearm in connection with *any* federal felony. §102, 82 Stat. 1224. The 1984 amendments *narrowed* §924(c) by limiting its predicate offenses to "crimes of violence." But the case-specific reading would go a long way toward nullifying that limitation and restoring the statute's original breadth. After all, how many felonies don't involve a substantial risk of physical force when they're committed using a firearm—let alone when the defendant brandishes or discharges the firearm?

Recognizing this difficulty, the government assures us that a jury wouldn't be allowed to find a felony to be a crime of violence *solely* because the defendant used a firearm, although it could consider the firearm as a "factor." Tr. of Oral Arg. 8. But the government identifies no textual basis for this rule, and exactly how it would work in practice is anyone's guess. The government says, for example, that "selling counterfeit handbags" while carrying a gun wouldn't be a crime of violence under its approach. *Id.*, at 9. But why not? Because the counterfeit-handbag trade is so inherently peaceful that there's no substantial risk of a violent confrontation with dissatisfied customers, territorial competitors, or dogged police officers? And how are jurors supposed to determine that? The defendant presumably knew the risks of his trade, and he chose to arm himself. See *United States* v. *Simms*, 914 F. 3d 229, 247–248 (CA4 2019) (en banc) (refusing to "condem[n] jurors to such an ill-defined inquiry"). Even granting the government its handbag example, we suspect

Opinion of the Court

its approach would result in the vast majority of federal felonies becoming potential predicates for §924(c) charges, contrary to the limitation Congress deliberately imposed when it restricted the statute's application to crimes of violence.

### D

With all this statutory evidence now arrayed against it, the government answers that it should prevail anyway because of the canon of constitutional avoidance. Maybe the case-specific approach doesn't represent the best reading of the statute—but, the government insists, it is our duty to adopt any "'fairly possible'" reading of a statute to save it from being held unconstitutional. Brief for United States 45.[6]

We doubt, however, the canon could play a proper role in this case even if the government's reading were "possible." True, when presented with two "fair alternatives," this Court has sometimes adopted the *narrower* construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly. *United States* v. *Rumely*, 345 U. S. 41, 45, 47 (1953); see, *e.g.*, *Skilling* v. *United States*, 561 U. S. 358, 405–406, and n. 40 (2010); *United States* v. *Lanier*, 520 U. S. 259, 265–267, and n. 6 (1997). But no one before us has identified a case in which this Court has invoked the canon to *expand* the reach of a criminal statute in order to save it. Yet that

---

[6] There are at least two different canons of construction that sometimes go by the name "constitutional avoidance." The one the government invokes here is perhaps better termed the presumption of constitutionality. Of long lineage, it holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional, see, *e.g.*, *Parsons* v. *Bedford*, 3 Pet. 433, 448–449 (1830) (Story, J.), and it is distinct from the more modern (and more debated) constitutional doubt canon, which suggests courts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality, see *Rust* v. *Sullivan*, 500 U. S. 173, 190–191 (1991).

is exactly what the government seeks here. Its case-specific reading would cause §924(c)(3)(B)'s penalties to apply to conduct they have not previously been understood to reach: categorically nonviolent felonies committed in violent ways. See *Simms*, 914 F. 3d, at 256–257 (Wynn, J., concurring).[7]

Employing the avoidance canon to expand a criminal statute's scope would risk offending the very same due process and separation-of-powers principles on which the vagueness doctrine itself rests. See *supra*, at 4–5. Everyone agrees that Mr. Davis and Mr. Glover did many things that Congress had declared to be crimes; and no matter how we rule today, they will face substantial prison sentences for those offenses. But does §924(c)(3)(B) require them to suffer additional punishment, on top of everything else? Even if you think it's *possible* to read the statute to impose such additional punishment, it's *impossible* to say that Congress surely intended that result, or that the law gave Mr. Davis and Mr. Glover fair warning that §924(c)'s mandatory penalties would apply to their conduct. Respect for due process and the separation of powers suggests a court may not, in order to save Congress the trou-

─────────────

[7]The government claims to have found cases invoking the canon to expand a statute's reach, but none actually stands for that proposition. Each simply remarks in passing that a construction the Court arrived at for other reasons had the additional benefit of avoiding vagueness concerns; none suggests that a narrower construction was available. See *United States* v. *Grace*, 461 U. S. 171, 176 (1983) (accepting government's construction, which was "not contested by appellees"); *United States* v. *Culbert*, 435 U. S. 371, 379 (1978) (finding statute clear and refusing to "manufacture ambiguity where none exists"); *United States* v. *Shreveport Grain & Elevator Co.*, 287 U. S. 77, 82–83 (1932) (finding statute unambiguous and construing it according to "the natural import of its terms"). And the dissent, despite compiling a page-long list of constitutional avoidance cases spanning "more than 200 years," *post*, at 25–26, has been unable to find any better examples. See *post*, at 29–30 (opinion of KAVANAUGH, J.).

Opinion of the Court

ble of having to write a new law, construe a criminal statute to penalize conduct it does not clearly proscribe.

Employing the canon as the government wishes would also sit uneasily with the rule of lenity's teaching that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor. That rule is "perhaps not much less old than" the task of statutory "construction itself." *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820) (Marshall, C. J.). And much like the vagueness doctrine, it is founded on "the tenderness of the law for the rights of individuals" to fair notice of the law "and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department." *Ibid.*; see *Lanier*, 520 U. S., at 265–266, and n. 5. Applying constitutional avoidance to narrow a criminal statute, as this Court has historically done, accords with the rule of lenity. By contrast, using the avoidance canon instead to adopt a more expansive reading of a criminal statute would place these traditionally sympathetic doctrines at war with one another.[8]

## IV

What does the dissent have to say about all this? It starts by emphasizing that §924(c)(3)(B) has been used in "tens of thousands of federal prosecutions" since its enactment 33 years ago. *Post*, at 2 (opinion of KAVANAUGH, J.). And the dissent finds it "surprising" and "extraordinary" that, after all those prosecutions over all that time,

---

[8] Admittedly, abandoning the categorical approach in favor of the case-specific approach would also have the effect of excluding from the statute's coverage defendants who commit categorically *violent* felonies in *nonviolent* ways, and in that respect would be more "lenient" for some defendants. Regardless, the constitutional principles underlying the rule of lenity counsel caution before invoking constitutional avoidance to construe the statute to punish conduct that it does not unambiguously proscribe.

the statute could "suddenly" be deemed unconstitutional. *Post*, at 2–3. But the government *concedes* that §924(c)(3)(B) is unconstitutional if it means what everyone has understood it to mean in nearly all of those prosecutions over all those years. So the only way the statute can be saved is if we were "suddenly" to give it a new meaning different from the one it has borne for the last three decades. And if we could do *that*, it would indeed be "surprising" and "extraordinary."

The dissent defends giving this old law a new meaning by appealing to intuition. It suggests that a categorical reading of §924(c)(3)(B) is "unnatural" because "[i]f you were to ask John Q. Public whether a particular crime posed a substantial risk of violence, surely he would respond, 'Well, tell me how it went down—*what happened*?'" *Post*, at 13 (some internal quotation marks omitted). Maybe so. But the language in the statute before us isn't the language posited in the dissent's push poll. Section 924(c)(3)(B) doesn't ask about the risk that "a particular crime posed" but about the risk that an "offense . . . by its nature, involves." And a categorical reading of this categorical language seemed anything but "unnatural" to the unanimous Court in *Leocal* or the plurality in *Dimaya*.[9] Nor did the government think the categorical reading of §924(c)(3)(B) "unnatural" when it embraced that reading for decades. The dissent asks us to overlook the government's prior view, explaining that the government only defended a categorical reading of the statute "when it did not matter for constitutional vagueness purposes"—that is, before *Johnson* and *Dimaya* identified constitutional problems with the categorical approach. *Post*, at 34. But

---

[9]To be sure, the dissent suggests that *Leocal* and *Dimaya* adopted a categorical reading simply to avoid practical and constitutional problems. *Post*, at 15–16, 23, and n. 23. But, as we have seen, this too is mistaken. *Leocal* did not even mention those problems, and *Dimaya* held that the text demanded a categorical approach. See *supra*, at 9.

isn't that exactly the point? Isn't it at least a little revealing that, when the government had no motive to concoct an alternative reading, even it thought the best reading of §924(c)(3)(B) demanded a categorical analysis?

If this line of attack won't work, the dissent tries another by telling us that we have "not fully account[ed] for the long tradition of substantial-risk criminal statutes." *Post*, at 34. The dissent proceeds to offer a lengthy bill of particulars, citing dozens of state and federal laws that do not use the categorical approach. *Post*, at 7–10, and nn. 4–17. But what does this prove? Most of the statutes the dissent cites impose penalties on whoever "creates," or "engages in conduct that creates," or acts under "circumstances that create" a substantial risk of harm; others employ similar language. Not a single one imposes penalties for committing certain acts during "an offense . . . that by its nature, involves" a substantial risk, or anything similar. Marching through the dissent's own catalog thus only winds up confirming that legislatures know how to write risk-based statutes that require a case-specific analysis—and that §924(c)(3)(B) is not a statute like that.

When the dissent finally turns to address the words Congress actually wrote in §924(c)(3)(B), its main argument seems to be that a categorical reading violates the canon against superfluity. On this account, reading "offense" generically in connection with the residual clause makes the residual clause "duplicate" the elements clause and leaves it with "virtually nothing" to do. *Post*, at 20. But that is a surprising assertion coming from the dissent, which devotes several pages to describing the "many" offenders who have been convicted under the residual clause using the categorical approach but who "might not" be prosecutable under the elements clause. *Post*, at 30–33. It is also wrong. As this Court has long understood, the residual clause, read categorically, "sweeps more broadly" than the elements clause—potentially reaching offenses,

like burglary, that do not have violence as an *element* but
that arguably create a substantial *risk* of violence. *Leocal*,
543 U. S., at 10. So even under the categorical reading,
the residual clause is far from superfluous.

Without its misplaced reliance on the superfluity canon,
there is little left of the dissent's textual analysis. The
dissent asserts that the phrase "by its nature" must
"focu[s] on the defendant's actual conduct"—but only
because this "follows" from the dissent's earlier (and mis-
taken) superfluity argument. *Post*, at 21. Next, the dis-
sent claims that "the word 'involves'" and "the phrase 'in
the course of committing the offense'" both support a case-
specific approach. *Post*, at 22. But these words do not
favor either reading: It is just as natural to ask whether
the offense of robbery *ordinarily* "involves" a substantial
risk that violence will be used "in the course of committing
the offense" as it is to ask whether a *particular* robbery
"involved" a substantial risk that violence would be used
"in the course of committing the offense." If anything, the
statute's use of the present and not the past tense lends
further support to the categorical reading.[10] The dissent
thinks it significant, too, that the statute before us "does
not use the term 'conviction,'" *post*, at 23; but that word is
hardly a prerequisite for the categorical approach, as
*Dimaya* makes clear. Remarkably, the dissent has noth-

---

[10] The dissent claims that *Taylor* v. *United States*, 495 U. S. 575
(1990), and *Nijhawan* v. *Holder*, 557 U. S. 29 (2009), pointed to "the
*absence* of the word 'involved'" as one reason to adopt a categorical
approach. *Post*, at 22. Not true. *Taylor* explained that the ACCA's
elements clause requires a categorical approach in part because it
refers to a crime "that 'has as an element'—not any crime that, in a
particular case, involves—the use or threat of force." 495 U. S., at 600.
All the work in that sentence was being done by the phrase "in a
particular case," not by the word "involves." And *Nijhawan* noted that
the Court had construed the ACCA's residual clause, which refers to
crimes "that '*involv[e] conduct* that presents a serious potential risk of
physical injury,'" to require the categorical approach. 557 U. S., at 36.

Opinion of the Court

ing at all to say about §924(c)(3)'s history or its relationship with other criminal statutes; it just ignores those arguments. And when it comes to the constitutional avoidance canon, the dissent does not even try to explain how using that canon to criminalize conduct that *isn't* criminal under the fairest reading of a statute might be reconciled with traditional principles of fair notice and separation of powers. Instead, the dissent seems willing to consign "'thousands'" of defendants to prison for "years—potentially decades," not because it is certain or even likely that Congress ordained those penalties, but because it is merely "possible" Congress might have done so. *Post*, at 30, 33–34. In our republic, a speculative possibility that a man's conduct violated the law should never be enough to justify taking his liberty.

In the end, the dissent is forced to argue that holding §924(c)(3)(B) unconstitutional would invite "bad" social policy consequences. *Post*, at 34. In fact, the dissent's legal analysis only comes sandwiched between a lengthy paean to laws that impose severe punishments for gun crimes and a rogue's gallery of offenses that may now be punished somewhat less severely. See *post*, at 1–2, 30–34. The dissent acknowledges that "the consequences cannot change our understanding of the law." *Post*, at 34. But what's the point of all this talk of "bad" consequences if not to suggest that judges should be tempted into reading the law to satisfy their policy goals? Even taken on their own terms, too, the dissent's policy concerns are considerably overblown. While the dissent worries that our ruling may elicit challenges to past §924(c) convictions, *post*, at 33, the dissent's preferred approach—saving §924(c)(3)(B) by changing its meaning—would also call into question countless convictions premised on the categorical reading. And defendants whose §924(c) convictions are overturned by virtue of today's ruling will not even necessarily receive lighter sentences: As this Court has noted, when a defend-

ant's §924(c) conviction is invalidated, courts of appeals "routinely" vacate the defendant's entire sentence on all counts "so that the district court may increase the sentences for any remaining counts" if such an increase is warranted. *Dean* v. *United States*, 581 U. S. ___, ___ (2017) (slip op., at 5).

Of course, too, Congress always remains free to adopt a case-specific approach to defining crimes of violence for purposes of §924(c)(3)(B) going forward. As Mr. Davis and Mr. Glover point out, one easy way of achieving that goal would be to amend the statute so it covers any felony that, "based on the facts underlying the offense, involved a substantial risk" that physical force against the person or property of another would be used in the course of committing the offense. Brief for Respondents 46 (quoting H. R. 7113, 115th Cong., 2d Sess. (2018); emphasis deleted); see also Tr. of Oral Arg. 19 (government's counsel agreeing that this language would offer "clearer" support for the case-specific approach than the current version of the statute does). The dissent's catalog of case-specific, risk-based criminal statutes supplies plenty of other models Congress could follow. Alternatively still, Congress might choose to retain the categorical approach but avoid vagueness in other ways, such as by defining crimes of violence to include certain enumerated offenses or offenses that carry certain minimum penalties. All these options and more are on the table. But these are options that belong to Congress to consider; no matter how tempting, this Court is not in the business of writing new statutes to right every social wrong it may perceive.

*

We agree with the court of appeals' conclusion that §924(c)(3)(B) is unconstitutionally vague. At the same time, exactly what that holding means for Mr. Davis and Mr. Glover remains to be determined. After the Fifth

Opinion of the Court

Circuit vacated their convictions and sentences on one of the two §924(c) counts at issue, both men sought rehearing and argued that the court should have vacated their sentences on all counts.  In response, the government conceded that, if §924(c)(3)(B) is held to be vague, then the defendants are entitled to a full resentencing, not just the more limited remedy the court had granted them.  The Fifth Circuit has deferred ruling on the rehearing petitions pending our decision, so we remand the case to allow the court to address those petitions.  The judgment below is affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 588 U. S. ____ (2019)            1

KAVANAUGH, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 18–431

## UNITED STATES, PETITIONER *v.* MAURICE LAMONT DAVIS AND ANDRE LEVON GLOVER

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2019]

JUSTICE KAVANAUGH, with whom JUSTICE THOMAS and JUSTICE ALITO join, and with whom THE CHIEF JUSTICE joins as to all but Part II–C, dissenting.

Crime and firearms form a dangerous mix. From the 1960s through the 1980s, violent gun crime was rampant in America. The wave of violence destroyed lives and devastated communities, particularly in America's cities. Between 1963 and 1968, annual murders with firearms rose by a staggering 87 percent, and annual aggravated assaults with firearms increased by more than 230 percent.

Faced with an onslaught of violent gun crime and its debilitating effects, the American people demanded action. In 1968, Congress passed and President Lyndon Johnson signed the Gun Control Act. That law made it a separate federal crime to use or carry a firearm during a federal felony. Despite that and other efforts, violent crime with firearms continued at extraordinarily dangerous levels. In 1984 and again in 1986, in legislation signed by President Reagan, Congress reenacted that provision of the 1968 Act, with amendments. The law now prohibits, among other things, using or carrying a firearm during and in relation to a federal "crime of violence." 18 U. S. C. §924(c)(1)(A). The law mandates substantial prison time for violators.

KAVANAUGH, J., dissenting

Over the last 33 years, tens of thousands of §924(c)
cases have been prosecuted in the federal courts. Mean-
while, violent crime with firearms has decreased signifi-
cantly. Over the last 25 years, the annual rate of murders
with firearms has dropped by about 50 percent, and the
annual rate of nonfatal violent crimes (robberies, aggra-
vated assaults, and sex crimes) with firearms has de-
creased by about 75 percent. Violent crime in general
(committed with or without a firearm) has also declined.
During that same time period, both the annual rate of
overall violent crime and the annual rate of murders have
dropped by almost 50 percent.

Although the level of violent crime in America is still
very high, especially in certain cities, Americans under the
age of 40 probably cannot fully appreciate how much safer
most American cities and towns are now than they were in
the 1960s, 1970s, and 1980s. Many factors have contrib-
uted to the decline of violent crime in America. But one
cannot dismiss the effects of state and federal laws that
impose steep punishments on those who commit violent
crimes with firearms.

Yet today, after 33 years and tens of thousands of federal
prosecutions, the Court suddenly finds a key provision of
§924(c) to be unconstitutional because it is supposedly too
vague. That is a surprising conclusion for the Court to
reach about a federal law that has been applied so often
for so long with so little problem. The Court's decision
today will make it harder to prosecute violent gun crimes
in the future. The Court's decision also will likely mean
that thousands of inmates who committed violent gun
crimes will be released far earlier than Congress specified
when enacting §924(c). The inmates who will be released
early are not nonviolent offenders. They are not drug
offenders. They are offenders who committed violent
crimes with firearms, often brutally violent crimes.

A decision to strike down a 33-year-old, often-prosecuted

KAVANAUGH, J., dissenting

federal criminal law because it is all of a sudden unconstitutionally vague is an extraordinary event in this Court. The Constitution's separation of powers authorizes this Court to declare Acts of Congress unconstitutional. That is an awesome power. We exercise that power of judicial review in justiciable cases to, among other things, ensure that Congress acts within constitutional limits and abides by the separation of powers. But when we overstep our role in the name of enforcing limits on Congress, we do not uphold the separation of powers, we transgress the separation of powers.

I fully understand how the Court has arrived at its conclusion given the Court's recent precedents in *Johnson* v. *United States*, 576 U. S. ____ (2015), and *Sessions* v. *Dimaya*, 584 U. S. ____ (2018). But this case presents an entirely different question. Those cases involved statutes that imposed additional penalties based on *prior* convictions. This case involves a statute that focuses on the defendant's current conduct during the charged crime. The statute here operates entirely in the present. Under our precedents, this statute therefore is not unconstitutionally vague. It is a serious mistake, in my respectful view, to follow *Johnson* and *Dimaya* off the constitutional cliff in this case. I respectfully dissent.[1]

## I

Section 924(c) prohibits using or carrying a firearm during and in relation to a federal "crime of violence," or

---

[1] The statistics contained in the introduction are drawn from: Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Reports 6–7, 8–9 (1963) (rise in violent crime with firearms in the 1960s); *id.*, at 1, 6–7, 9 (1968) (same); Pew Research Center, Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware 6, n. 5, and 36, 50 (2013) (decrease in violent crime with firearms over about the past 25 years); N. James, Congressional Research Service, Recent Violent Crime Trends in the United States 25–26 (Rep. No. R45236) (June 20, 2018) (decrease in violent crime over about the past 25 years).

4                    UNITED STATES *v.* DAVIS

KAVANAUGH, J., dissenting

possessing a firearm in furtherance of a federal "crime of violence."[2]   Section 924(c) is a substantive criminal offense, not a sentence enhancement.   The Government therefore charges a §924(c) offense in the indictment. Ordinarily, when charged under §924(c), a defendant will be charged with both an underlying federal crime and then also a §924(c) offense.   For example, Davis was charged with both conspiracy to commit robbery and a §924(c) offense.   Glover was likewise charged with both conspiracy to commit robbery and a §924(c) offense.

By any measure, Davis and Glover's conduct during the conspiracy was violent.   Davis and Glover committed multiple armed robberies of convenience stores in the early morning hours.   Those armed robberies followed a pattern: Davis and Glover (or Glover and a co-conspirator)—usually covering their faces—would arrive at a convenience store in the early morning hours in a car with no plates.   One of them would point a short-barreled shotgun at a female employee and order her around. Sometimes, he would point the short-barreled shotgun in her face.   Sometimes, he would put the short-barreled

---

[2] Section 924(c)(1)(A) provides: "Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—(i) be sentenced to a term of imprisonment of not less than 5 years; (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years."   Section 924(c)(1)(B) imposes heightened penalties for certain types of firearms and firearm devices, and §924(c)(1)(C) imposes heightened penalties for subsequent §924(c) convictions.

KAVANAUGH, J., dissenting

shotgun in her side. While one of them was aiming the short-barreled shotgun at the store employee, another would take cigarettes and demand money. Davis and Glover's crime spree ended with still more dangerous behavior: a high-speed car chase in wet and dangerous driving conditions that culminated in a crash.

Section 924(c)(3) lays out the definition of "crime of violence" for purposes of §924(c). That definition has two prongs, either of which can bring a defendant within the scope of §924(c).[3]

The first prong of §924(c)(3) is the elements prong. That prong, the Government concedes here, asks whether the underlying crime *categorically* fits within §924(c) because of the elements of the crime. The judge makes that determination. If the answer is yes, then the judge instructs the jury on the §924(c) offense to simply find whether the defendant used or carried a firearm during and in relation to that underlying crime, or possessed a firearm in furtherance of that underlying crime.

The Fifth Circuit concluded that Davis and Glover's conspiracy offenses did not fit within the elements prong of §924(c)(3). So the question was whether Davis and Glover were covered by the second prong.

The second prong of §924(c)(3) is the substantial-risk prong. That prong covers cases beyond those covered by the first prong, the elements prong. Congress sensibly wanted to cover defendants who committed crimes that are not necessarily violent by definition under the elements prong, but who committed crimes with firearms in a

---

[3] Section 924(c)(3) provides: "For purposes of this subsection the term 'crime of violence' means an offense that is a felony and—(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

way that created a substantial risk that violent force would be used. To that end, the substantial-risk prong, properly read, focuses not on the elements of the underlying crime, but rather on the defendant's conduct during that crime. If a defendant used or carried a firearm during and in relation to the crime, *and* the defendant's conduct during the crime created a substantial risk that physical force may be used, then the defendant may be guilty of a §924(c) offense. In that instance, the jury makes the finding: Did the defendant's conduct during the underlying crime create a substantial risk that violent force would be used?

In other words, as relevant here, a defendant can fall within the scope of §924(c) either (1) because of the elements of the underlying crime or (2) because of the defendant's conduct in committing the underlying crime. Either (1) the judge finds that an element of the underlying crime entails the use of physical force or (2) the jury finds that the defendant's actual conduct involved a substantial risk that physical force may be used. Put another way, the underlying crime itself may automatically bring the defendant within the scope of §924(c). Or if the underlying crime does not automatically qualify as a crime of violence, then the defendant's conduct during the crime may still bring the defendant within the scope of §924(c). Sensible enough.

The basic question in this case is whether the substantial-risk prong of §924(c)(3)'s definition of "crime of violence" is unconstitutionally vague. It is not.

As this Court has explained multiple times, criminal laws that apply a risk standard to a defendant's conduct are not too vague, but instead are perfectly constitutional. Writing for the Court in *Johnson*, for example, Justice Scalia stated that "we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." 576

KAVANAUGH, J., dissenting

U. S., at ___ (slip op., at 12).  The following year in *Welch* v. *United States*, Justice Kennedy confirmed that *Johnson* "cast no doubt on the many laws that 'require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*.'" 578 U. S. ___, ___–___ (2016) (slip op., at 3–4) (quoting *Johnson*, 576 U. S., at ___ (slip op., at 12)).  Two years later in *Dimaya*, JUSTICE KAGAN wrote for the Court and echoed Justice Scalia and Justice Kennedy: "In *Johnson*'s words, 'we do not doubt' the constitutionality of applying §16(b)'s 'substantial risk [standard] to real-world conduct.'" 584 U. S., at ___–___ (slip op., at 10–11) (quoting *Johnson*, 576 U. S., at ___ (slip op., at 12)).

That kind of risk-based criminal statute is not only constitutional, it is very common.  As the Court has recognized, "dozens of federal and state criminal laws use terms like 'substantial risk,' 'grave risk,' and 'unreasonable risk,'" and almost all of those statutes "require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*." *Johnson*, 576 U. S., at ___ (slip op., at 12).  Indeed, the Government's brief in *Johnson* collected more than 200 state and federal statutes that imposed criminal penalties for conduct that created a risk of injury to others.  App. to Supp. Brief for United States in *Johnson* v. *United States*, O. T. 2014, No. 13–7120, pp. 1a–99a.

Take a few examples from federal law: It is a federal crime to create "a *substantial risk* of harm to human life" while illegally "manufacturing a controlled substance." 21 U. S. C. §858 (emphasis added).  Under certain circumstances, it is a federal crime to create "a *substantial risk* of serious bodily injury to any other person by destroying or damaging any structure, conveyance, or other real or personal property within the United States or by attempting or conspiring to" do so.  18 U. S. C. §2332b(a)(1)(B) (emphasis added).  And for purposes of the chapter of the

8                  UNITED STATES *v.* DAVIS

KAVANAUGH, J., dissenting

federal criminal code dealing with sexual abuse crimes, "serious bodily injury" is defined as "bodily injury that involves a *substantial risk* of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." §2246(4) (emphasis added).

The States' criminal codes are similar. Among the crimes that the States define by using qualitative risk standards are resisting arrest,[4] kidnaping,[5] assault,[6] battery,[7] criminal recklessness,[8] endangerment,[9] unlawful

---

[4]See, *e.g.*, Colo. Rev. Stat. §18–8–103(1)(b) (2018) ("substantial risk of causing bodily injury"); Ind. Code §35–44.1–3–1(b)(1)(B) (2019) ("substantial risk of bodily injury"); Mo. Rev. Stat. §575.150 (2016) ("substantial risk of serious physical injury or death"); Neb. Rev. Stat. §28–904(1)(b) (2016) ("substantial risk of causing physical injury"); Ore. Rev. Stat. §162.315(2)(c) (2017) ("substantial risk of physical injury").

[5]See, *e.g.*, Alaska Stat. §11.41.300(a)(2)(B) (2018) ("substantial risk of serious physical injury"); Ohio Rev. Code Ann. §2905.01(B) (Lexis Supp. 2019) ("substantial risk of serious physical harm").

[6]See, *e.g.*, Ala. Code §13A–6–20(a)(3) (2015) ("grave risk of death"); Del. Code Ann., Tit. 11, §613(a)(3) (2015) ("substantial risk of death"); D. C. Code §22–404.01(a)(2) (2018 Cum. Supp.) ("grave risk of serious bodily injury"); Mo. Rev. Stat. §565.056(1)(4) (2016) ("substantial risk of death or serious physical injury"); Utah Code §76–5–102(1)(b) (2017) ("substantial risk of bodily injury").

[7]See, *e.g.*, Ind. Code §35–42–2–1.5 (Supp. 2018) ("substantial risk of death"); Wis. Stat. §940.19(6) (2016) ("substantial risk of great bodily harm").

[8]See, *e.g.*, Me. Rev. Stat. Ann., Tit. 17–A, §211(1) (2006) ("substantial risk of serious bodily injury"), §213(1) (same); Okla. Stat., Tit. 21, §1289.11 (2011) ("unreasonable risk and probability of death or great bodily harm"); Wis. Stat. Ann. §939.24(1) (2016) ("unreasonable and substantial risk of death or great bodily harm").

[9]See, *e.g.*, Ariz. Rev. Stat. Ann. §§13–1201(A), (B) (2010) ("substantial risk of imminent death or physical injury" and "substantial risk of imminent death"); N. D. Cent. Code Ann. §12.1–17–03 (2012) ("substantial risk of serious bodily injury or death"); Ore. Rev. Stat. §163.195(1) (2017) ("substantial risk of serious physical injury"); Wash. Rev. Code §9A.36.050(1) (2018) ("substantial risk of death or serious physical

restraint,[10] theft,[11] hazing,[12] abuse,[13] neglect,[14] arson,[15] homicide,[16] and weapons offenses.[17]

---

injury").

[10] See, *e.g.*, Ark. Code §5–11–103(a) (2013) ("substantial risk of serious physical injury"); Conn. Gen. Stat. §53a–95(a) (2017) ("substantial risk of physical injury"); Tex. Penal Code Ann. §20.02(c)(2)(A) (2019) ("substantial risk of serious bodily injury").

[11] See, *e.g.*, Ind. Code §35–43–4–2(a)(2)(B) (2018) ("substantial risk of bodily injury"); Minn. Stat. §609.52(3a) (2016) ("reasonably foreseeable risk of bodily harm").

[12] See, *e.g.*, Ind. Code §35–42–2–2.5(a) (2018) ("substantial risk of bodily injury"); Miss. Code. Ann. §§97–3–105(1), (3) (2014) ("substantial risk of physical injury"); Mo. Rev. Stat. §§578.365(1), (5) (2016) ("probable risk of the loss of life or probable bodily or psychological harm" and "substantial risk to the life of the student or prospective member"); Ohio Rev. Code Ann. §2903.31(A) (Lexis 2014) ("substantial risk of causing mental or physical harm"); Ore. Rev. Stat. §§163.197(4)(a)(B), (C) (2017) ("unreasonable risk of harm").

[13] See, *e.g.*, Iowa Code §709.3(1)(a) (2019) ("substantial risk of death or serious injury"); N. C. Gen. Stat. Ann. §14–318.2(a) (2017) ("substantial risk of physical injury"); W. Va. Code Ann. §§61–8D–3(c), (d)(1) (2014) ("substantial risk of death or serious bodily injury" and "substantial risk of bodily injury"); Wis. Stat. §§948.03(1), (4)(a), (b) (2016) ("unreasonable risk of harm," "unreasonable risk of great bodily harm," and "unreasonable risk of bodily harm").

[14] See, *e.g.*, Fla. Stat. §825.102(3)(a) (2018) ("substantial risk of death"), §827.03(1)(e) (same); W. Va. Code Ann. §§61–8D–4(c), (d)(1) (2014) ("substantial risk of death or serious bodily injury" and "substantial risk of bodily injury").

[15] See, *e.g.*, Kan. Stat. Ann. §§21–5812(c)(2)(A)(i), (ii) (2018 Cum. Supp.) ("substantial risk of bodily harm"); R. I. Gen. Laws §11–4–2 (2002) ("substantial risk of serious physical harm"); Wis. Stat. §§941.11(1), (2) (2016) ("unreasonable risk of death or great bodily harm").

[16] See, *e.g.*, Ala. Code §13A–6–2(a)(2) (2015) ("grave risk of death"); Kan. Stat. Ann. §21–5406(a) (2018 Cum. Supp.) ("unreasonable risk of injury"); N. Y. Penal Law Ann. §125.20(4) (West 2009) ("grave risk of serious physical injury"), §§125.25(2), (4) ("grave risk of death" and "grave risk of serious physical injury or death").

[17] See, *e.g.*, Alaska Stat. §11.61.190(a)(2) (2018) ("substantial and unjustifiable risk of physical injury"); Ark. Code Ann. §5–74–107(b)(1) (Supp. 2017) ("substantial risk of physical injury"); Ohio Rev. Code

KAVANAUGH, J., dissenting

Consider a few specific examples: In Pennsylvania, a person resists arrest "if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a *substantial risk* of bodily injury to the public servant or anyone else." 18 Pa. Cons. Stat. §5104 (2015) (emphasis added). In Tennessee, kidnaping is defined as false imprisonment "under circumstances exposing the other person to *substantial risk* of bodily injury." Tenn. Code Ann. §39–13–303(a) (2018) (emphasis added). In New York, reckless endangerment occurs when a person "recklessly engages in conduct which creates a *substantial risk* of serious physical injury to another person." N. Y. Penal Law Ann. §120.20 (emphasis added). And in Maryland, neglect of a minor is defined as "the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a *substantial risk* of harm to the minor's physical health or a *substantial risk* of mental injury to the minor." Md. Crim. Law Code Ann. §3–602.1(a)(5)(i) (2012) (emphasis added).

The above examples demonstrate that substantial-risk standards like the one in §924(c)(3)(B) are a traditional and common feature of criminal statutes. As the Eleventh Circuit succinctly stated, there "is nothing remarkable about asking jurors to make that sort of risk determination—and, if necessary, requiring judges to instruct jurors on the meaning of terms like 'substantial' and 'physical force.'" *Ovalles* v. *United States*, 905 F. 3d 1231, 1250, n. 8 (2018) (en banc). That is "exactly how similar questions have been resolved for centuries and are resolved every day in courts throughout the country." *Ibid.*

───────

Ann. §2923.162(C)(2) (Lexis 2014) ("substantial risk of physical harm"); R. I. Gen. Laws §11–47–61 (2002) ("substantial risk of death or serious injury"); Wash. Rev. Code §9A.36.045(1) (2018) ("substantial risk of death or serious physical injury"); W. Va. Code Ann. §61–7–12 (2014) ("substantial risk of death or serious bodily injury").

KAVANAUGH, J., dissenting

A statute is unconstitutionally vague only if "it fails to give ordinary people fair notice of the conduct it punishes," or is "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U. S., at ___ (slip op., at 3). Section 924(c)(3)(B) is not unconstitutionally vague. To reiterate, §924(c)(3)(B) defines "crime of violence" as "an offense that is a felony and . . . that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Section 924(c)(3)(B) affords people of ordinary intelligence ample notice that they may be punished if they carry or use a gun while engaging in criminal conduct that presents a risk that physical force may be used. There "is a whole range of conduct that anyone with at least a semblance of common sense would know" is covered by §924(c)(3)(B). *Chicago* v. *Morales*, 527 U. S. 41, 114 (1999) (THOMAS, J., dissenting) (internal quotation marks omitted). And prosecutors, defense attorneys, judges, and juries are well equipped to enforce and defend §924(c)(3)(B) prosecutions in a principled and predictable way—just as they have for decades with many other substantial-risk criminal statutes. As Judge Niemeyer wrote in his separate opinion in the Fourth Circuit, "the parties in those cases had little difficulty understanding, enforcing, or defending the §924(c)(1) charges at issue." *United States* v. *Simms*, 914 F. 3d 229, 264 (2019).[18]

In short, §924(c)(3)(B) is a garden-variety, substantial-risk criminal law. Section 924(c)(3)(B) is not unconstitutionally vague.

## II

This case therefore should be straightforward. But the Court complicates things by engaging in a two-step dance

---

[18] Judge Niemeyer's opinion was joined by Judges Wilkinson, Duncan, Agee, Keenan, and Quattlebaum.

KAVANAUGH, J., dissenting

that ends with the Court concluding that §924(c)(3)(B) is unconstitutionally vague.

The Court's first step is to construe §924(c)(3)'s substantial-risk prong to require an ordinary-case categorical approach rather than a conduct-specific approach. In other words, the Court says that a defendant's guilt or innocence under §924(c)(3)'s substantial-risk prong hinges on a judge's assessment of how a *hypothetical defendant* would ordinarily commit the underlying crime. In the Court's view, a defendant's guilt or innocence under §924(c)(3)'s substantial-risk prong does not depend on a jury's finding about how the *actual defendant* actually committed the underlying crime.

The Court's second step is based on the Court's decisions in *Johnson* and *Dimaya*. The Court says that the ordinary-case categorical approach makes §924(c)(3)(B) unconstitutionally vague.

For purposes of this case, the Court's error is its first step—that is, in construing the substantial-risk prong of §924(c)(3) to require an ordinary-case categorical approach. For three reasons, I disagree with the Court's analysis. First, the Court's justifications in *Johnson* and *Dimaya* for adopting the categorical approach do not apply in the context of §924(c). Second, the text of §924(c)(3)(B) is best read to focus on the actual defendant's actual conduct during the underlying crime, not on a hypothetical defendant's imagined conduct during an ordinary case of the underlying crime. Third, even if the text were ambiguous, the constitutional avoidance canon requires that we interpret the statute to focus on the actual defendant's actual conduct.

I will address those three points in Parts II–A, II–B, and II–C.

### A

According to the Court, if §924(c)(3)(B) focused on the

KAVANAUGH, J., dissenting

defendant's conduct during the underlying crime, then it would *not* be unconstitutionally vague. But §924(c)(3)(B), as the Court reads it, focuses on a hypothetical defendant's conduct during an ordinary case of the underlying crime. As a result, the Court says that §924(c)(3)(B) *is* unconstitutionally vague.

But it makes little sense, as I see it, to say that §924(c)(3)(B)'s substantial-risk inquiry focuses on whether *a hypothetical defendant's imagined conduct* during an ordinary case of the crime creates a substantial risk that physical force may be used, rather than on whether *the actual defendant's actual conduct* during the actual crime created a substantial risk that physical force may be used. Why would we interpret a federal law that criminalizes current-offense conduct to focus on a hypothetical defendant rather than on the actual defendant? As Judge Newsom cogently wrote for the Eleventh Circuit en banc majority, "If you were to ask John Q. Public whether a particular crime posed a substantial risk of violence, surely he would respond, 'Well, tell me how it went down—*what happened?*'" *Ovalles*, 905 F. 3d, at 1241.[19]

Why does the Court read the substantial-risk prong in such an unnatural way? The Court explains that *Johnson* interpreted similar substantial-risk language to require the ordinary-case categorical approach. See 576 U. S., at ___–___ (slip op., at 12–13). A plurality of the Court did the same in *Dimaya*. See 584 U. S., at ___–___ (slip op., at 12–15). And the Court today casts this case as the third installment in a trilogy with a predictable ending, one that was supposedly foreordained by *Johnson* and *Dimaya*.

The gaping hole in the Court's analysis, in my view, is that *Johnson* and *Dimaya* addressed statutes that im-

---

[19] Judge Newsom's majority opinion was joined by Chief Judge Ed Carnes and Judges Tjoflat, Marcus, William Pryor, Rosenbaum, Branch, and Hull.

posed penalties based on a defendant's *prior* criminal convictions.

In *Johnson*, the Court interpreted a definition of "violent felony" that was used in sentencing proceedings to classify prior convictions as predicates for stricter sentences. See §§924(e)(1), (e)(2)(B). In *Dimaya*, the Court interpreted a definition of "crime of violence" that was used in immigration proceedings to classify prior convictions as predicates for more severe immigration consequences. See §16 (defining "crime of violence"); 8 U. S. C. §1101(a)(43)(F) (incorporating 18 U. S. C. §16); 8 U. S. C. §1227(a)(2)(A)(iii) (deportation); §§1229b(a)(3), (b)(1)(C) (ineligibility for cancellation of removal and adjustment of status).

In interpreting those statutes, the Court employed the ordinary-case categorical approach to assess an individual's *past* convictions. And application of that categorical approach, the Court then said, rendered the statutes at issue in those cases unconstitutionally vague. See *Dimaya*, 584 U. S., at ___–___ (slip op., at 9–11); *Johnson*, 576 U. S., at ___–___ (slip op., at 5–6).[20]

Two important principles drove the Court's adoption of the categorical approach in the *prior*-conviction context in *Johnson* and *Dimaya*.

*First*, in the prior-conviction cases, the Court emphasized that the categorical approach avoids the difficulties and inequities of relitigating "past convictions in minitrials conducted long after the fact." *Moncrieffe* v. *Holder*, 569 U. S. 184, 200–201 (2013). Without the categorical approach, courts would have to determine the underlying

---

[20] Tellingly, the Government in *Johnson* and *Dimaya* did not dispute that the categorical approach was the proper method of interpreting the statutes at issue. See *Sessions* v. *Dimaya*, 584 U. S. ___, ___ (2018) (plurality opinion) (slip op., at 13); *Johnson* v. *United States*, 576 U. S. ___, ___ (2015) (slip op., at 13). In this case, the Government strenuously disputes the applicability of the categorical approach precisely because the inquiry is not about past convictions.

KAVANAUGH, J., dissenting

conduct from years-old or even decades-old documents with varying levels of factual detail. See *Taylor* v. *United States*, 495 U. S. 575, 601–602 (1990). The factual statements that are contained in those documents are often "prone to error." *Mathis* v. *United States*, 579 U. S. ___, ___ (2016) (slip op., at 10). The categorical approach avoids the unfairness of allowing inaccuracies to "come back to haunt the defendant many years down the road." *Id.*, at ___ (slip op., at 11). The Court has echoed that reasoning time and again. See, *e.g.*, *Dimaya*, 584 U. S., at ___ (plurality opinion) (slip op., at 15); *Johnson*, 576 U. S., at ___ (slip op., at 13); *Descamps* v. *United States*, 570 U. S. 254, 270 (2013); *Chambers* v. *United States*, 555 U. S. 122, 125 (2009).

*Second*, in the prior-conviction cases, the Court insisted on the categorical approach to avoid "Sixth Amendment concerns." *Descamps*, 570 U. S., at 269. The Sixth Amendment, as interpreted by this Court's precedents, does not allow a judge (rather than a jury) to make factual determinations that increase the maximum penalty. See *Apprendi* v. *New Jersey*, 530 U. S. 466, 490 (2000). The Court has read its Sixth Amendment precedents to require the categorical approach. Under the categorical approach, the judge looks only to the fact of conviction and the statutory definition of the prior offense. The Court has reiterated those Sixth Amendment concerns in countless categorical-approach cases. See, *e.g.*, *Dimaya*, 584 U. S., at ___ (plurality opinion) (slip op., at 13); *Mathis*, 579 U. S., at ___ (slip op., at 10); *Shepard* v. *United States*, 544 U. S. 13, 24–25 (2005) (plurality opinion); *Taylor*, 495 U. S., at 601.

In short, the Court in *Johnson* and *Dimaya* employed something akin to the constitutional avoidance doctrine to read the statutes at issue to avoid practical and Sixth Amendment problems. In the words of JUSTICE THOMAS, the "categorical approach was never really about the best reading of the text." *Dimaya*, 584 U. S., at ___ (dissenting

16                    UNITED STATES *v.* DAVIS

opinion) (slip op., at 28). As Judge Raggi has perceptively stated: "[C]onstitutional avoidance informed the original categorical-approach mandate." *United States* v. *Barrett*, 903 F. 3d 166, 179 (CA2 2018).

But neither of the two reasons identified in *Johnson* and *Dimaya* applies to 18 U. S. C. §924(c)(3)(B)—not even a little.

*First*, §924(c) does not require examination of old conduct underlying a *prior* conviction. Section 924(c) operates entirely in the present. In a §924(c) prosecution, there are ordinarily two charged crimes: the underlying crime and the §924(c) offense. Here, for example, the defendants were charged with conspiracy to commit robbery and with the §924(c) offense. The defendant's conduct during the underlying crime is part of the §924(c) offense. The conduct charged in the §924(c) offense is in front of the jury (if the case goes to trial) or accepted by the defendant in the plea agreement (if the defendant pleads guilty). The indictment must allege specific offense conduct, and that conduct must be proved with real-world facts in order to obtain a conviction. There is no need to worry about stale evidence or unavailable witnesses. Nor is there any need to worry about inaccuracies in years-old or decades-old documents coming back to haunt the defendant.

*Second*, §924(c) likewise raises no Sixth Amendment concerns. A jury will find the facts or, if the case ends in a guilty plea, the defendant will accept the facts in the plea agreement. For the §924(c) charge, as relevant here, a jury must find that the defendant's conduct "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The defendant has the opportunity to contest the relevant facts either at the trial or in plea negotiations. No Sixth Amendment issue arises in a §924(c) prosecution.

No practical or Sixth Amendment problems exist with

KAVANAUGH, J., dissenting

§924(c)(3)(B). Indeed, the Court itself acknowledges that "a case-specific approach wouldn't yield the same practical and Sixth Amendment complications" that arose in *Johnson* and *Dimaya*. *Ante*, at 8.

We should recognize that *Johnson* and *Dimaya* dealt with an entirely different context: *prior* convictions. There is no need to follow *Johnson* and *Dimaya* off the cliff here. We should read §924(c)(3)(B) like the dozens of other substantial-risk statutes in federal and state criminal law: to focus on the actual defendant's actual conduct during the actual underlying crime, not on a hypothetical defendant's imagined conduct during an ordinary case of that crime.

### B

Now to the statutory text of §924(c)(3)(B). Even though the context here is current-offense conduct, not past convictions, the Court says that the statutory language nonetheless compels a focus on a hypothetical defendant's imagined conduct, not on the actual defendant's actual conduct. I disagree. Criminal defendants are usually punished based on what they actually did, not based on what a hypothetical defendant might have done.

To begin with, the text of §924(c)(3)(B) must be interpreted against the backdrop of traditional criminal-law practice. As described above, substantial-risk statutes are commonplace in federal and state criminal law. Those statutes ordinarily call for examination of the actual defendant's actual conduct during the actual crime. The Court does not identify a single self-contained federal or state law that defines the *actus reus* of the crime based on the imagination of the judge about a hypothetical defendant, rather than on the evidence before the jury about the actual defendant.

This Court applied an exception in *Johnson* and *Dimaya* for substantial-risk statutes that impose sentencing and

other penalties based on *past* convictions.  But that is an exception for past convictions, not a rule for current-offense conduct.  Section 924(c)(3)(B) must be read in line with the traditional, common practice of focusing on the actual defendant's actual conduct during the underlying crime.

With that background, I turn to the precise text of §924(c)(3).  To repeat, the text of §924(c)(3) provides: A defendant may not use or carry a firearm during and in relation to, or possess a firearm in furtherance of, "an offense that is a felony and" that either (A) "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or (B) "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

I will focus on four particular aspects of the statutory text of §924(c)(3)(B).

*First,* start with the term "offense."  Section 924(c)(3) has two prongs under which a defendant might qualify for a §924(c) conviction: first, if the underlying crime automatically qualifies as a crime of violence based on its elements; and, second, if the defendant's conduct during the underlying crime created a substantial risk that physical force may be used, even if the underlying crime by its elements does not constitute a crime of violence.

The term "offense" applies to both prongs.  In the elements prong, the term refers to the elements of the underlying crime.  In the substantial-risk prong, the term refers to the defendant's conduct during the underlying crime. That is entirely commonplace and sensible.

Reading "offense" in that commonsense way follows from the Court's precedents interpreting the term "offense."  As the Court has explained many times, the term "offense" may "sometimes refer to a generic crime" and may "sometimes refer to the specific acts in which an