KAVANAUGH, J., dissenting

offender engaged on a specific occasion." *Nijhawan* v. *Holder*, 557 U. S. 29, 33–34 (2009).[21]  Indeed, the single term "offense" can refer to both in the same statutory scheme. See, *e.g.*, *id.*, at 40; *id.*, at 38 (listing other examples); *United States* v. *Hayes*, 555 U. S. 415, 421–422 (2009).

In *United States* v. *Hayes*, for example, the Court interpreted the term "misdemeanor crime of domestic violence." That term was defined as "an offense" that (1) "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon," and (2) was "committed by" a person who has a particular relationship with the victim.  §921(a)(33)(A).  The Court interpreted the "offense that . . . has, as an element" language in that provision to focus on the legal prohibition, and interpreted the "offense . . . committed by" language to focus on the defendant's conduct.  See *Hayes*, 555 U. S., at 421–422.  In other words, the term "offense" was used once but had two different meanings as applied to the two different parts of the statutory provision.

Another example is the Immigration and Nationality Act.  That statute defines "aggravated felony" in part as "an offense" (1) that "involves fraud or deceit" and (2) "in which the loss to the victim or victims exceeds $10,000."  8 U. S. C. §1101(a)(43)(M)(i).  The Court interpreted the "offense that . . . involves fraud or deceit" language to focus on the legal prohibition.  See *Kawashima* v. *Holder*, 565 U. S. 478, 483 (2012).  And the Court interpreted the "offense . . . in which the loss" language to focus on the individual's conduct.  See *Nijhawan*, 557 U. S., at 40. Again, the term "offense" was used once, but had two

---

[21]More generally, this Court has often said that "identical language may convey varying content" in the same statute, based on context. *Yates* v. *United States*, 574 U. S. 528, 537 (2015) (plurality opinion); see also *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 319–320 (2014).

KAVANAUGH, J., dissenting

different meanings as applied to the two different parts of the statutory provision.

Section 924(c)(3) is the same kind of statutory provision. It likewise encompasses both the legal prohibition (in subpart (A)) and the defendant's actual conduct (in subpart (B)). The term "offense" was read in *Hayes*, *Kawashima*, and *Nijhawan* to encompass both the legal prohibition and the defendant's conduct. The term should be read that same way here.

Moreover, if the substantial-risk prong of §924(c)(3) requires assessing a hypothetical defendant's conduct rather than the actual defendant's conduct, then there would be little daylight between the elements prong and the substantial-risk prong. After all, a crime is defined by its elements. The elements tell you what happens in an ordinary case of a crime. To imagine how a hypothetical defendant would have committed an ordinary case of the crime, you would presumably look back to the elements of the crime. But doing that under the substantial-risk prong—as the Court would do—would just duplicate the inquiry that already occurs under the elements prong. That would defeat Congress' purpose in adding the substantial-risk prong to §924(c)(3)—namely, covering defendants who committed crimes that are not violent by definition but that are committed by particular defendants in ways that create a risk of violence. There is no reason to think that Congress meant to duplicate the elements prong in the substantial-risk prong.[22]

The Court usually tries to avoid an interpretation of a statutory provision that would make the provision redundant and accomplish virtually nothing. See, *e.g., Republic*

---

[22] This duplication point is icing on a textual cake already frosted. In other words, our interpretation of the term "offense" is informed by the text and by our precedents. Our interpretation stands with or without the duplication argument.

KAVANAUGH, J., dissenting

*of Sudan* v. *Harrison*, 587 U. S. ___, ___ (2019) (slip op., at 10); *Dastar Corp.* v. *Twentieth Century Fox Film Corp.*, 539 U. S. 23, 35 (2003); *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 837 (1988); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174–179 (2012); W. Eskridge, Interpreting Law: A Primer on How to Read Statutes and the Constitution 112–114 (2016). We should heed that principle here, and recognize that the term "offense" in the substantial-risk prong refers to the actual defendant's conduct during the underlying crime.

In short, the term "offense" in §924(c)(3), as applied to the substantial-risk prong, focuses on the actual defendant's actual conduct, not on a hypothetical defendant's imagined conduct.

*Second*, §924(c)(3)(B) asks whether the defendant's offense "by its nature" involves a risk that physical force may be used. In a vacuum, the "nature" of an offense could be either "the metaphysical 'nature' of the offense" or "the underlying facts of the offense." *Dimaya*, 584 U. S., at ___ (THOMAS, J., dissenting) (slip op., at 24). But that is because the term "offense" could refer to a legal prohibition or to the defendant's actual conduct. As explained above, however, the term "offense" as applied to the substantial-risk prong refers to the actual defendant's conduct during the underlying crime. It follows that "by its nature" focuses on the nature of the actual defendant's conduct during the crime. The phrase "by its nature" is linked to the term "offense." If the term "offense" refers to the defendant's actual conduct, then "by its nature" also focuses on the defendant's actual conduct.

Under the conduct-specific approach to the substantial-risk prong, the "by its nature" language simply means that the Government has to show more than a defendant's proclivity for crime and more than the mere fact that the defendant was carrying a gun. The Government has to

KAVANAUGH, J., dissenting

show that the defendant's conduct by its nature *during the crime* created a substantial risk that physical force may be used.

In short, as JUSTICE THOMAS has pointed out, it "is entirely natural to use words like 'nature' and 'offense' to refer to an offender's actual underlying conduct." *Ibid.* So it is here.

*Third*, §924(c)(3)(B) asks whether the defendant's conduct "involves" a substantial risk that physical force may be used. In *Taylor* v. *United States*, a case involving a prior-conviction statutory provision, the Court pointed to the *absence* of the word "involved" in adopting a categorical approach. 495 U. S., at 600. And in *Nijhawan* v. *Holder*, another case involving a prior-conviction statutory provision, the Court explained that the word "involves" did not support a categorical approach. 557 U. S., at 36. Here, unlike in *Taylor*, the statute does use the word "involves." Under *Taylor*'s reasoning, the inclusion of the word "involves" in §924(c)(3)(B) supports the conclusion that §924(c)(3)(B) employs a conduct-specific approach rather than a categorical approach.

*Fourth*, §924(c)(3)(B)'s use of the phrase "in the course of committing the offense" indicates that the proper focus is on the actual defendant's actual conduct, not on a hypothetical defendant's imagined conduct. After all, the underlying offense was committed by the actual defendant, not by a hypothetical defendant. It strains common sense to think that the "in the course of committing the offense" language in §924(c)(3)(B) contemplates an inquiry into a hypothetical defendant's conduct during an ordinary case of the crime.

Importantly, the law at issue in *Johnson* did not have the "in the course of committing the offense" language. §924(e)(2)(B)(ii). That is a major textual difference between the law in *Johnson* on the one hand and §924(c)(3)(B) on the other hand. And that textual distinc-

KAVANAUGH, J., dissenting

tion further shows that §924(c)(3)(B) focuses on the actual defendant's actual conduct.

In short, those four textual indicators, while not all entirely one-sided, together strongly suggest that §924(c)(3)(B) focuses on the actual defendant's actual conduct during the actual crime, not on a hypothetical defendant's imagined conduct during an ordinary case of the crime.

On top of all the language in the statute, §924(c)(3)(B) does *not* contain the critical term that ordinarily marks a categorical approach.

Section 924(c)(3)(B) does not use the term "conviction." This Court has historically recognized the term "conviction" as a key textual driver of the categorical approach. In cases such as *Taylor* and *Johnson,* the Court zeroed in on the word "convictions." See *Johnson,* 576 U. S., at ___ (slip op., at 13); *Taylor,* 495 U. S., at 600; see also *Mathis,* 579 U. S., at ___ (slip op., at 9); *Moncrieffe,* 569 U. S., at 191; *Ovalles,* 905 F. 3d, at 1245. So too, the Court in *Leocal* v. *Ashcroft* emphasized that the text of the INA that incorporated §16(b) used the term "convicted." 543 U. S. 1, 4, 7 (2004).[23]

The term "conviction" is nowhere to be found in the text of §924(c)(3)(B). That should not come as a surprise, given that §924(c)(3)(B) is a substantive criminal offense concerned with the defendant's current-offense conduct. The absence of the term "conviction" in §924(c)(3)(B) strongly

---

[23] In *Leocal,* the Court interpreted §16(b) to require a categorical approach. But unlike §924(c)(3)(B), that statutory provision applied in the context of past convictions. See 8 U. S. C. §§1101(a)(43)(F), 1227(a)(2)(A)(iii); Sentencing Reform Act of 1984, §217(a), 98 Stat. 2021; Comprehensive Crime Control Act of 1984, §1202, 98 Stat. 2151. To be sure, §16(b) was once incorporated into §924(c). But in 1986, Congress severed the two provisions and included a standalone "crime of violence" definition in §924(c). For those two reasons, §924(c)(3)(B) need not and should not be interpreted in the same way as §16(b).

supports a conduct-specific approach.

Put simply, the textual clues—both the words that are used and the words that are not used—point strongly to the conclusion that §924(c)(3)(B) requires a jury to assess the actual defendant's actual conduct during the underlying crime. The conclusion becomes overwhelming when considered against the general background of substantial-risk statutes. To be sure, a statute can always be written more clearly. But here, the textual toolkit leads decisively to that conclusion.

## C

But after all of that, suppose that you are not convinced. Suppose that you think that this case is still a close call on the text, even with the background of substantial-risk statutes and the Court's precedents. Indeed, suppose you ultimately disagree with the above analysis of the text. Even so, the Government still wins—unless it can be said that §924(c)(3)(B) *unambiguously* requires a categorical approach. Under the constitutional avoidance canon, the precise question before us is not whether §924(c)(3)(B) is best read to require a conduct-specific approach, but rather (as the Court's cases say) whether §924(c)(3)(B) can reasonably, plausibly, or fairly possibly be interpreted to require a conduct-specific approach. The answer to that question is easy. Yes. See *Hooper* v. *California*, 155 U. S. 648, 657 (1895) ("reasonable"); *Clark* v. *Martinez*, 543 U. S. 371, 380 (2005) ("plausible"); *Skilling* v. *United States*, 561 U. S. 358, 406 (2010) ("fairly possible" (internal quotation marks omitted)).

The Court says that if §924(c)(3)(B) requires the categorical approach, then it is unconstitutionally vague. But the Court also says that if §924(c)(3)(B) focuses on the defendant's actual conduct, then it is constitutionally permissible. As the Court puts it, "a case-specific approach would avoid the vagueness problems that doomed the statutes in

KAVANAUGH, J., dissenting

*Johnson* and *Dimaya*." *Ante*, at 8.  So the entire ball game is whether it is fairly possible to interpret §924(c)(3)(B) to require a conduct-specific approach.  It surely is at least fairly possible.

It is an elementary principle of statutory interpretation that an ambiguous statute must be interpreted, whenever possible, to avoid unconstitutionality.  See generally Scalia, Reading Law: The Interpretation of Legal Texts, at 247–251; Eskridge, Interpreting Law: A Primer on How to Read Statutes and the Constitution, at 317–322.  That uncontroversial principle of statutory interpretation dates back to the Founding era.  See *Mossman* v. *Higginson*, 4 Dall. 12, 14 (1800).  As JUSTICE THOMAS has explained, the traditional doctrine of constitutional avoidance commands "courts, when faced with two plausible constructions of a statute—one constitutional and the other unconstitutional—to choose the constitutional reading." *Clark*, 543 U. S., at 395 (dissenting opinion).  This Court's duty is "not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations." *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 571 (1973).  In discharging that duty, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper*, 155 U. S., at 657.

This Court's longstanding practice of saving ambiguous statutes from unconstitutionality where fairly possible affords proper respect for the representative branches of our Government.  The Court has explained that "a presumption never ought to be indulged, that congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the Court by language altogether unambiguous." *United States* v. *Coombs*, 12 Pet. 72, 76 (1838).

In countless cases for more than 200 years, this Court has recognized the principle that courts should construe

ambiguous laws to be consistent with the Constitution. See, *e.g., McDonnell* v. *United States,* 579 U. S. ___, ___–___ (2016) (slip op., at 23–24); *Skilling,* 561 U. S., at 405–409; *Clark,* 543 U. S., at 380–382; *Edmond* v. *United States,* 520 U. S. 651, 658 (1997); *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.,* 508 U. S. 602, 628–630 (1993); *New York* v. *United States,* 505 U. S. 144, 170 (1992); *Rust* v. *Sullivan,* 500 U. S. 173, 190–191 (1991); *Public Citizen* v. *Department of Justice,* 491 U. S. 440, 465–467 (1989); *Communications Workers* v. *Beck,* 487 U. S. 735, 762 (1988); *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575–578 (1988); *St. Martin Evangelical Lutheran Church* v. *South Dakota,* 451 U. S. 772, 780–781 (1981); *Letter Carriers,* 413 U. S., at 571; *Machinists* v. *Street,* 367 U. S. 740, 749–750 (1961); *Ashwander* v. *TVA,* 297 U. S. 288, 348 (1936) (Brandeis, J., concurring); *ICC* v. *Oregon-Washington R. & Nav. Co.,* 288 U. S. 14, 40–42 (1933); *Crowell* v. *Benson,* 285 U. S. 22, 62–63 (1932); *Lucas* v. *Alexander,* 279 U. S. 573, 577–578 (1929); *Richmond Screw Anchor Co.* v. *United States,* 275 U. S. 331, 345–346 (1928); *Blodgett* v. *Holden,* 275 U. S. 142, 148–149 (1927) (opinion of Holmes, J.); *Missouri Pacific R. Co.* v. *Boone,* 270 U. S. 466, 471–472 (1926); *Linder* v. *United States,* 268 U. S. 5, 17–18 (1925); *Panama R. Co.* v. *Johnson,* 264 U. S. 375, 390 (1924); *Texas* v. *Eastern Texas R. Co.,* 258 U. S. 204, 217 (1922); *Baender* v. *Barnett,* 255 U. S. 224, 225–226 (1921); *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401 (1916); *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 407–408 (1909); *Hooper,* 155 U. S., at 657; *Grenada County Supervisors* v. *Brogden,* 112 U. S. 261, 268–269 (1884); *Coombs,* 12 Pet., at 76; *Parsons* v. *Bedford,* 3 Pet. 433, 448–449 (1830); *Mossman,* 4 Dall., at 14.

To be clear, the case before us is not a case of avoiding

KAVANAUGH, J., dissenting

*possible* unconstitutionality.  This is a case of avoiding *actual* unconstitutionality.  There is a debate about the former practice.  There is no real debate about the latter rule.  And it is the latter rule of statutory interpretation at issue here.

Section 924(c)(3)(B) is best read to focus on the defendant's actual conduct.  But at a minimum—given the text, the background of substantial-risk laws, and the relevant precedents—it is fairly possible to interpret §924(c)(3)(B) to focus on the defendant's actual conduct.  Because that reasonable interpretation would save §924(c)(3)(B) from unconstitutionality, this case should be very straightforward, as Judge Newsom explained in his thorough majority opinion in the Eleventh Circuit and as Judge Niemeyer and Judge Richardson explained in their persuasive separate opinions in the Fourth Circuit.  *Ovalles*, 905 F. 3d, at 1251; *Simms*, 914 F. 3d, at 272 (opinion of Niemeyer, J.); *id.*, at 272–277 (opinion of Richardson, J.).  We should prefer the constitutional reading over the unconstitutional reading.

The Court did not apply constitutional avoidance in *Johnson* and *Dimaya*.  Why not?  In those two cases, the Court explained, the canon of constitutional avoidance was essentially rendered a nullity.  That is because, as the Court described the situation, the Court was between a rock and a hard place.  The categorical approach would have led to Fifth Amendment vagueness concerns, whereas applying the conduct-specific approach would have led to Sixth Amendment jury-trial concerns.  See *Dimaya*, 584 U. S., at ___–___ (plurality opinion) (slip op., at 13–14).

Here, by contrast, the Court is not between a rock and a hard place.  Applying the categorical approach to §924(c)(3)(B) would lead to vagueness concerns, whereas applying the conduct-specific approach would lead to no constitutional concerns.

Faced with a choice between a rock and constitutionality,

the Court chooses the rock. I do not understand that choice.

The Court offers two related reasons for its choice to run the statute into a rock. Neither reason holds up.

*First,* the Court concludes that the constitutional avoidance canon must yield to the rule of lenity. That argument disregards the Court's oft-repeated statements that the rule of lenity is a tool of last resort that applies "only when, after consulting traditional canons of statutory construction," grievous ambiguity remains. *Hayes,* 555 U. S., at 429 (internal quotation marks omitted); see also, *e.g., Ocasio* v. *United States,* 578 U. S. ___, ___, n. 8 (2016) (slip op., at 13, n. 8) ("after seizing everything from which aid can be derived" (internal quotation marks omitted)); *Muscarello* v. *United States,* 524 U. S. 125, 138 (1998) (same); *United States* v. *Wells,* 519 U. S. 482, 499 (1997) (same); *Reno* v. *Koray,* 515 U. S. 50, 65 (1995) (same); *United States* v. *Shabani,* 513 U. S. 10, 17 (1994) ("after consulting traditional canons of statutory construction"); *Smith* v. *United States,* 508 U. S. 223, 239 (1993) ("after seizing every thing from which aid can be derived" (internal quotation marks and alterations omitted)); *Moskal* v. *United States,* 498 U. S. 103, 108 (1990) ("*after* resort to the language and structure, legislative history, and motivating policies of the statute" (internal quotation marks omitted)); *Callanan* v. *United States,* 364 U. S. 587, 596 (1961) ("at the end of the process of construing what Congress has expressed").

The constitutional avoidance canon is a traditional canon of statutory interpretation. The constitutional avoidance canon is employed to reach a reasonable interpretation of an ambiguous statute. Where, as here, that canon applies and yields such a reasonable interpretation, no grievous ambiguity remains. The rule of lenity has no role to play. Contrary to the Court's assertion, the canon of constitutional avoidance is not "at war" with the rule of

KAVANAUGH, J., dissenting

lenity. *Ante*, at 19. The canon of constitutional avoidance
precedes the rule of lenity because the rule of lenity comes
into play (this Court has said countless times) only "*after*
consulting traditional canons of statutory construction."
*Hayes*, 555 U. S., at 429 (emphasis added; internal quota-
tion marks omitted). The rule of lenity "comes into opera-
tion at the end of the process of construing what Congress
has expressed, not at the beginning as an overriding con-
sideration of being lenient to wrongdoers." *Callanan*, 364
U. S., at 596.

In addition, the rule of lenity is triggered only in the
face of "grievous ambiguity." *Muscarello*, 524 U. S., at 139
(internal quotation marks omitted). To reiterate,
§924(c)(3)(B) is best read to focus on the actual defendant's
actual conduct. But to the extent that there is any ambi-
guity in §924(c)(3)(B), that ambiguity is far from grievous.

*Second*, and relatedly, the Court claims that the canon
of constitutional avoidance, as a general matter, cannot be
relied upon to broaden the scope of a criminal statute, as
opposed to narrowing the scope of a criminal statute. And
the Court says that the canon cannot be used here be-
cause, in the Court's view, relying on the constitutional
avoidance canon in this case would expand the scope of
§924(c)(3)(B). I disagree for two independent reasons.

To begin with, that theory seems to come out of no-
where. The Court's novel cabining of the constitutional
avoidance canon is not reflected in this Court's precedents.
On the contrary, it contradicts several precedents. This
Court has applied the constitutional avoidance canon even
when avoiding the constitutional problems would have
broadened the statute's scope. For example, in *United
States* v. *Culbert*, this Court rejected a narrowing con-
struction of the Hobbs Act because that construction
would have raised vagueness concerns. 435 U. S. 371, 374
(1978); see also *United States* v. *Shreveport Grain & Ele-
vator Co.*, 287 U. S. 77, 82 (1932); cf. *United States* v.

KAVANAUGH, J., dissenting

*Grace*, 461 U. S. 171, 176 (1983).

Moreover, the premise of this novel broadening/ narrowing theory is flawed. A categorical approach to §924(c)(3)(B) would not be inherently narrower than a conduct-specific approach. Each approach would sweep in some crimes that the other would not. On the one hand, some crimes that might be deemed categorically violent sometimes may be committed in nonviolent ways. Those crimes would be covered by the categorical approach but not by a conduct-specific approach. On the other hand, some categorically nonviolent crimes are committed in violent ways. Those crimes would not be covered by the categorical approach but would be covered by a conduct-specific approach. See *Johnson*, 576 U. S., at ___ (ALITO, J., dissenting) (slip op., at 12).

In sum, the constitutional avoidance canon makes this an especially straightforward case. It is at least fairly possible to read §924(c)(3)(B) to focus on the actual defendant's actual conduct during the actual crime. End of case.

### III

The consequences of the Court's decision today will be severe. By invalidating the substantial-risk prong of §924(c)(3), the Court's decision will thwart Congress' law enforcement policies, destabilize the criminal justice system, and undermine safety in American communities. If the law required those results, we would have to swallow the consequences. But the law, in my respectful view, does no such thing.

The Court's decision means that people who in the future commit violent crimes with firearms may be able to escape conviction under §924(c). In enacting §924(c), Congress sought to keep firearms away from violent criminal situations. Today, the Court invalidates a critical provision designed to achieve that goal. To be sure, many

Cite as: 588 U. S. ____ (2019)          31

KAVANAUGH, J., dissenting

violent crimes still might fall within §924(c)(3)'s elements
clause. But many others might not. When defendants use
firearms during conspiracies to commit robbery, arsons,
attempted carjackings, and kidnapings, to name just a
few, they might no longer be subject to prosecution under
§924(c). See, *e.g.*, *Simms*, 914 F. 3d, at 233–234 (conspiracy
to commit robbery); *United States* v. *Salas*, 889 F. 3d 681,
683–684 (CA10 2018) (arson); *United States* v. *Jenkins*,
849 F. 3d 390, 393 (CA7 2017) (kidnaping).

To get a flavor of the offenders who will now potentially
avoid conviction under §924(c), consider a sample of those
offenders who have been convicted under §924(c)(3)'s
substantial-risk prong:

- One defendant committed assault with intent to
  commit murder. The defendant shot his wife multiple
  times while the couple was camping in Buffalo River
  National Park. See *United States* v. *Prickett*, 839
  F. 3d 697, 698 (CA8 2016).

- One defendant committed arson. The defendant used
  a molotov cocktail to firebomb the Irish Ink Tattoo
  Shop. See *Salas*, 889 F. 3d, at 683; *United States* v.
  *Salazar*, 2014 WL 12788997, *1 (NM, Aug. 14, 2014).

- One defendant and others kidnaped a man who they
  believed had stolen money and an Xbox from the de-
  fendant. They beat the man severely and threatened
  to kill him. See Pet. for Cert. in *United States* v. *Jen-
  kins*, O. T. 2017, No. 17–97, p. 2.

- One defendant committed conspiracy to commit rob-
  bery. The defendant and his co-conspirators planned
  to steal Percocet and cash from a man they thought
  was a drug dealer. Armed with a pistol and a crow-
  bar, they broke into the man's home by shattering a
  sliding glass door and found three men there. One of
  the defendant's co-conspirators attacked all three men
  with the crowbar, and the defendant threatened the

KAVANAUGH, J., dissenting

men with a pistol multiple times. See *United States* v.
*Douglas*, 907 F. 3d 1, 4–5 (CA1 2018).

- One defendant committed attempted carjacking.
  Armed with guns and baseball bats, the defendant
  and her co-conspirators robbed a grocery store and
  carjacked two vehicles, pistol whipping the owner of
  one of the vehicles in the process. They then attempted
  to carjack a third vehicle. They approached a family
  getting out of a minivan and demanded the keys. One
  of the defendant's co-conspirators hit a 13-year-old
  girl in the mouth with a baseball bat. Another shot
  an AK–47 at the girl's family. See *Ovalles*, 905 F. 3d,
  at 1235.

- One defendant operated multiple houses of prostitu-
  tion in Annapolis. The defendant threatened per-
  ceived competitors with violence. He also beat and
  threatened women, sometimes to compel them to en-
  gage in prostitution. See *United States* v. *Fuertes*, 805
  F. 3d 485, 490–492 (CA4 2015).

- One defendant committed conspiracy to commit rob-
  bery. In the middle of the night, the defendant and a
  co-conspirator crawled into a McDonald's through the
  drive-through window. The defendant pointed a gun
  at the restaurant's manager and attempted to hit an-
  other employee. The defendant demanded money,
  and the manager complied. The defendant then re-
  moved the money from the cash drawer, pistol
  whipped the manager, threw the cash drawer at the
  other employee, and fled the scene along with his co-
  conspirators and $1,100. See *Simms*, 914 F. 3d, at
  232.

- One defendant committed conspiracy to commit rob-
  bery. The defendant and his co-conspirators commit-
  ted a string of armed robberies of small businesses.
  During the robberies, they wore masks and gloves.

KAVANAUGH, J., dissenting

They were armed with guns, knives, and baseball bats. They injured several people during the course of their robberies, breaking bones, drawing blood, and knocking people out. They also shot and killed one of their victims point blank. See *Barrett*, 903 F. 3d, at 170, 184.

Those real-life stories highlight a second unfortunate consequence of the Court's decision. Many offenders who have already committed violent crimes with firearms—and who have already been convicted under §924(c)—may be released early from prison. The Court's decision will apply to all defendants whose convictions are not yet final on direct review and who preserved the argument. With the benefit of this Court's decision, many dangerous offenders who received lengthy prison sentences as a result of their violent conduct might walk out of prison early. And who knows whether the ruling will be retroactive? Courts will be inundated with collateral-review petitions from some of the most dangerous federal offenders in America. As Judge Niemeyer wrote in his separate opinion in the Fourth Circuit, "thousands of §924(c)(1) convictions will unnecessarily be challenged as premised on what the majority today concludes is an unconstitutionally vague provision, even though the parties in those cases had little difficulty understanding, enforcing, or defending the §924(c)(1) charges at issue." *Simms*, 914 F. 3d, at 264.

Moreover, defendants who successfully challenge their §924(c) convictions will not merely be resentenced. Rather, their §924(c) convictions will be thrown out altogether. That is because, to restate an obvious point, §924(c) defines a substantive criminal offense. To be sure, the §924(c) defendants may also be serving other sentences for other convictions (for instance, if they were convicted of and sentenced for the underlying crime of violence). But with the benefit of the Court's decision, they may be able to get their §924(c) convictions tossed and lop off years—

KAVANAUGH, J., dissenting

potentially decades—from their total prison time.

All because the Court thinks that §924(c)(3)(B) *unambiguously* compels a focus on the imagined conduct of a hypothetical defendant rather than on the actual conduct of the actual defendant. That analysis is not persuasive, especially in light of the constitutional avoidance doctrine. It is true that the Government once advocated for a categorical approach. But in the early years after Congress added a "crime of violence" definition to §924(c), before courts settled on a categorical approach, the Government correctly argued for a conduct-specific approach to the substantial-risk prong. See, *e.g., United States* v. *Cruz,* 805 F. 2d 1464, 1469 (CA11 1986). The Government later changed its tune only after the courts settled on a categorical approach—at a time when it did not matter for constitutional vagueness purposes, before *Johnson* and *Dimaya.* In any event, the question is what to do now after *Johnson* and *Dimaya.* The answer should not be hard. To quote Judge William Pryor, writing for five judges in the Eleventh Circuit, how "did we ever reach the point where" we "must debate whether a carjacking in which an assailant struck a 13-year-old girl in the mouth with a baseball bat and a cohort fired an AK–47 at her family is a crime of violence? It's nuts." *Ovalles,* 905 F. 3d, at 1253 (concurring opinion).

To be sure, the consequences cannot change our understanding of the law. But when the consequences are this bad, it is useful to double-check the work. And double-checking here, in my view, reveals several problems: relying on cases from the prior-conviction context whose rationales do not apply in this current-offense context; not fully accounting for the long tradition of substantial-risk criminal statutes; not reading the words of the statute in context and consistent with precedents such as *Hayes;* and then, perhaps most problematically, misapplying the longstanding constitutional avoidance canon. After

KAVANAUGH, J., dissenting

double-checking, it should be evident that the law does not compel those serious consequences. I am not persuaded that the Court can blame this decision on Congress. The Court has a way out, if it wants a way out.

\*          \*          \*

The Court usually reads statutes with a presumption of rationality and a presumption of constitutionality. Instead of reading §924(c)(3)(B) to ensure that it is constitutional, the Court reads §924(c)(3)(B) in a way that makes it unconstitutional. The bedrock principle that the Court interprets ambiguous statutes to avoid unconstitutionality is seemingly transformed into a principle of interpreting ambiguous statutes to lead to unconstitutionality.

I respect and entirely understand how the Court got here. *Johnson* and *Dimaya* were earth-rattling decisions. But we should not follow *Johnson* and *Dimaya* off the constitutional cliff in this different §924(c) context. Unlike the statutes at issue in *Johnson* and *Dimaya*, this statute is not a prior-conviction statute. This statute operates entirely in the present and is not remotely vague. I respectfully dissent.