

**U.S. Department of Justice**
*United States Attorney*
*District of New Jersey*

---

*970 Broad Street, Suite 700*     *(973) 645-2700*
*Newark, New Jersey 07102*

January 3, 2020

**VIA ECF AND ELECTRONIC MAIL**

Honorable Kevin McNulty, U.S.D.J.
U.S. Post Office and U.S. Courthouse
Federal Square
Newark, New Jersey 07102

      Re:    <u>United States v. William Green</u>
            Crim. No. 19-525 (KM)

Dear Judge McNulty:

      Please accept this letter brief in lieu of a more formal submission as the Government's opposition to defendant William Green's ("Green") motion to dismiss the indictment (Dkt. No. 22).  Green contends that the statute charged in the indictment, 18 U.S.C. § 1960, which makes it illegal to operate an unlicensed money transmitting business, does not state a criminal offense, and is unconstitutionally vague, because, by its own terms, the statute does not expressly apply to exchanges involving virtual currency, including Bitcoin. Defendant's arguments have been repeatedly rejected by the Courts based on a plain reading of the statute and a review of the legislative intent.  For the reasons set forth herein, the Government respectfully submits that Green's motion should be denied.

## I.   Factual Background and Procedural History[1]

Beginning in or around September 2017, Green sold Bitcoin to the public in exchange for U.S. currency through his online business, "Destination Bitcoin."  The Destination Bitcoin website advertised that the business was created with the "average person in mind who wants to purchase and learn about crypto currency."  Green offered the following rates:  10% for purchases of less than half of one Bitcoin and 5% for purchases more than half of one Bitcoin.  These rates were significantly higher than those offered by the most popular regulated Bitcoin exchanges, which range from .1% to 1% per transaction.

According to financial records, Green accepted U.S. currency via cash payments and wire transfers from various individuals and entities in the United States and at least one individual in Australia.  Shortly after receiving these funds, Green converted the currency into Bitcoin for a fee through a

---

[1] In evaluating a Rule 12 motion to dismiss, a district court must "adhere to the fundamental principle that . . . a court must accept as true all of the facts alleged." *United States v. Huet*, 665 F.3d 588, 597 (3d Cir. 2012). A court's review of a motion to dismiss an indictment "is a narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury." *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011). That standard is appropriate because "[t]he government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to" Rule 29. *United States v. DeLaurentis,* 230 F.3d 659, 660-61 (3d Cir. 2000). As a result, the Court's ruling "is not . . . a permissible vehicle for addressing the sufficiency of the government's evidence," *Bergrin*, 650 F.3d at 268 (quotation omitted), and the Court should "limit its inquiry to the four corners of the Indictment" and not consider extrinsic evidence "to discern the Government's theory of the case," *Huet*, 665 F.3d at 593.

personal account that he maintained at Gemini Trust Company LLC ("Gemini"), a Bitcoin exchange located in New York, NY.[2]  Shortly after purchasing the Bitcoin, Green would transfer it to multiple different digital Bitcoin wallets as requested by his customers.  In total, Green exchanged approximately $2 million in U.S. Currency into Bitcoin through Destination Bitcoin.  At least a portion of those funds was determined through investigation to be the proceeds of criminal activity.  For example, in February 2018, Green exchanged $154,888.23, which was determined to be the proceeds of a business email compromise ("BEC") scheme.[3]

Records obtained from Gemini revealed that Green opened an account at Gemini on or about June 10, 2017 (the "Green Gemini Account").  According to its website, Gemini

> is regulated by the New York State Department of Financial Services (NYSDFS). As a trust company, we are a fiduciary and must meet the capitalization, compliance, anti-money laundering, consumer protection, and cybersecurity requirements as set forth by the NYSDFS and protect the interests of our customers first and foremost.
>
> As a trust company, we are statutorily exempt from having to register with the Financial Crimes Enforcement Network (FinCEN), a bureau of the U.S. Department of Treasury. We do, however, have an

---

[2] Gemini charges its customers a rate of 1% per transaction.

[3] A BEC Scheme is one where bad actors target employees with access to company finances and trick them into making wire transfers to bank accounts thought to belong to trusted partners.  Instead, the funds are transferred to accounts controlled by the bad actors or individuals acting on behalf of the bad actors.

> account with FinCEN so that we can file necessary
> compliance reports.

*See* https://gemini24.zendesk.com/hc/en-us/articles/204734485-Is-Gemini-licensed-and-or-regulated-.  To satisfy Gemini's know-your-customer obligations when he registered the Green Gemini Account, Green told Gemini that he was going to use the account to invest extra income in virtual currency. Green claimed that he received this extra income from life insurance, a home equity line of credit, and other businesses.  Green never made mention of Destination Bitcoin.

On or about January 8, 2018, Gemini sent an email to Green stating that a review of his account showed high transfer activity and several large dollar deposits, all of which was unusual for a personal account.  Gemini requested additional information regarding the source of the funds being deposited. Green responded on or about January 17, 2018 by telling Gemini that he was employed by a consulting/sales company called "Tomorrow's Office," and attaching a paystub displaying year-to-date earnings of $453,266.93.  Green further said that he was a "large trader" and falsely offered that he was trading his own personal funds.  The Green Gemini Account was later closed on or about March 14, 2018 because Green did not provide a sufficient source of funds.

Between December 6, 2018 and February 7, 2019, law enforcement, while acting in an undercover capacity, made four separate purchases of Bitcoin from Green through Destination Bitcoin ranging in amounts of $3,885

to $12,000.  On one occasion, Green met an undercover agent at a restaurant near Green's house and accepted $12,000 in cash in a paper bag before later exchanging the funds into Bitcoin.  In all of his interactions with law enforcement, Green never asked for any personal identifying information from the agent posing as a customer.

A search of government databases confirmed that neither Green nor Destination Bitcoin nor any other business associated with Green was registered as a money transmitting business with the United States Department of the Treasury.

On March 1, 2019, Green was arrested and charged by criminal complaint for violating Title 18, United States Code, Section 1960 (Operating an Unlicensed Money Transmitting Business). <u>See</u> Dkt. 1.  On July 24, 2019, a grand jury sitting in Newark, New Jersey indicted Green on the same charge in a one-count indictment.  <u>See</u> Dkt. 13.

On November 12, 2019, Green filed the instant motion to dismiss the indictment.  <u>See</u> Dkt. No. 22.  Green claims that the indictment merits dismissal under Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure for failure to state an offense, arguing, in part, that Bitcoin do not qualify as "funds" under § 1960.  <u>Id.</u>  Green additionally argues that Section 1960 is unconstitutionally vague and that, under the rule of lenity, the ambiguities present in Section 1960 should be resolved in his favor.  For the reasons set

forth below, Green's arguments are without merit and his motion should be denied.

## II.     Statutory and Regulatory Framework

A.     <u>18 U.S.C. 1960</u>

Title 18, United States Code, Section 1960 was created as part of an anti-money laundering effort, "designed to prevent the movement of funds in connection with drug dealing." <u>United States v. Faiella</u>, 39 F. Supp. 3d 544, 545-46 (S.D.N.Y. 2014) (quoting <u>United States v. Bah</u>, 574 F.3d 106, 112 (2d Cir. 2009)). Originally enacted via the Annunzio-Wylie Anti-Money Laundering Act, Pub. L. No. 102-550, § 1512, 106 Stat. 3672, 4057-58 (1992), the statute's current form (as charged in the indictment) came through the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 (hereinafter "the Act"), in the aftermath of the September 11, 2001 terrorist attacks on the United States. <u>See</u> USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 296, 339. According to the House Committee on Financial Services report on the bill that would be incorporated into the Act, the purpose of the Act was to "provide[] the United States government with new tools to combat the financing of terrorism and other financial crimes." H.R. Rep. No. 107-250, at 33 (2001). The following was cited as among the need for legislation:

> Despite evidence suggesting [Osama] Bin Laden and Al Qaeda utilize formal banking relationships as part of their global financial network, experts believe that a major share of terrorist financing is conducted through international cash couriers as well as through informal banking systems, like the ancient South Asian money

> exchange system called hawala. The latter consists of an international network of non-bank financial agents, often built on trusted family or cultural relationships. In most cases, the funds themselves are never transferred, just messages relating to receipt or disbursement of funds. These underground systems are exploited by terrorists and other financial criminals because of the lack of record-keeping and opportunity for anonymity.

Id. at 34.  Thus, the Act amended numerous statutes, including § 1960, to help identify, trace, and track the flow of illicit wealth, both derived from and intended to promote unlawful activity, through informal funds transfer systems.

Section 1960(b)(1) broadly defines an "unlicensed money transmitting business" as a money transmitting business which affects interstate or foreign commerce in any manner or degree and which satisfies one of three additional requirements (only one of which involves a license).  The applicable requirement in this case is § 1960(b)(1)(B), that the business failed to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330 or regulations prescribed thereunder.  Section 1960 broadly defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  See § 1960(b)(2).

As referenced in § 1960(b)(1)(B), § 5330 governs the registration of money transmitting businesses with the Secretary of the Treasury.  See § 5330(a)(1). Under § 5330(d), a "money transmitting business" includes any "person who engages as a business in an informal money transfer system or any network of

people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system," is required to file reports under § 5313, and is not a depository institution.

Section 5313 governs the filing of reports on domestic coins and currency transactions.  Under § 5313(a):

> When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

Under § 5312(a)(2)(R), a domestic financial institution includes any "person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system."  This portion of the definition for a domestic financial institution under § 5312(a)(2)(R) is identical to the above-excerpted definition for a money transmitting business under § 5330(d).  According to this statutory interplay, any domestic financial institution that qualifies as a money transmitting business would trigger the reporting duty under § 5313 "if, when, and as the

transmitter does engage in currency transactions." <u>United States v. E-Gold, Ltd.</u>, 550 F. Supp. 2d 82, 95 (D.D.C. 2008).

Applicable regulations prescribed under § 5330 are at Title 31, Parts 1010 and 1022 of the Code of Federal Regulations. 31 C.F.R. § 1010.11(ff) and (ff)(5)(A) define a "money services business" to include a "person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern," who "provides money transmission services." "Money transmission services," in turn, mean "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." <u>Id.</u> § 1010.11(ff)(5)(A). Such money services businesses must register with FinCEN. <u>See id.</u> § 1022.380(a). Failure to register is criminally punishable under 18 U.S.C. § 1960. <u>See id.</u> § 1022.380(e). Such money services businesses must also file currency transaction reports under various circumstances outlined in the regulations. <u>See id.</u> §§ 1022.300, <u>et seq.</u>

B.   <u>FinCEN Guidance</u>

The Financial Crimes Enforcement Network ("FinCEN") is a bureau within the Department of Treasury. The Bank Secrecy Act and its implementing regulations require entities called Money Service Businesses ("MSBs")[4] to register with the Financial Crimes Enforcement Network by filing a

---

[4]  MSBs are a larger group of entities that encompass money transmitters. According to FinCEN, the term MSB includes any person doing business, whether or not on a regular basis or as an organized business concern, in one

Registration of Money Services Business ("RMSB") and to renew the registration every two years.  <u>See</u> 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380.  Federal law also criminalizes the operation of an MSB without the appropriate registration. See 18 U.S.C. § 1960(b)(1)(B).  This is a requirement separate and apart from state registrations, if any, that may be required by law.

On March 18, 2013, FinCEN released guidance about the requirement of certain participants in the virtual currency arena (which includes Bitcoin) to register as money service businesses under federal regulation. A summary of relevant portions of that guidance is as follows:

a.  The guidance defines three categories of participants in the virtual currency ecosystem: "exchangers", "administrators", and "users".

b.  The guidance defines an exchanger as a person or entity "engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency."

c.  The guidance states that an exchanger who (1) accepts and transmits a convertible virtual currency; or (2) buys or sells convertible virtual currency for any reason is a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person. FinCEN's regulations provide that whether a person is a money transmitter is a matter of facts and circumstances.  The regulations also define the term "money transmitter" as a person that provides money transmission services, or any other person engaged in the transfer of funds.

_____

or more of the following capacities: (1) Currency dealer or exchanger; (2) Check casher; (3) Issuer of traveler's checks, money orders or stored value; (4) Seller or redeemer of traveler's checks, money orders or stored value; (5) Money transmitter; or (6) U.S. Postal Service.

     d.    The regulations define the term "money transmitter" as a person that provides money transmission services, or any other person engaged in the transfer of funds; the term "money transmission services" means "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means."

     e.    The guidance makes clear that exchangers are MSBs that must register with FinCEN, unless they fall within an exemption. Once a person or entity is registered with FinCEN as a money service business, they are subject to certain requirements under the Bank Secrecy Act and its implementing regulations.

## III.   Background on Bitcoin

Commonly called a "virtual currency" or "cryptocurrency," Bitcoin is an electronic medium of exchange that exists as entries on a distributed "blockchain" ledger. The blockchain ledger records all Bitcoin transactions ever "made" by documenting, among other data, the number of bitcoins transferred from one "public address" to another. A public address is an alphanumeric string that typically bears no identifiers for who "controls" it. It is somewhat analogous to a bank account number, but with at least one crucial distinction in practice: A bank account number is useless unless paired with a routing number that identifies the financial institution that services the account, which in turn can identify the account holder. A Bitcoin public address is not, by design, hitched to a comparable source of identification, and thus tends to anonymize its use.

Bitcoin is not known to be created by any sovereign state, nor are bitcoins issued as legal tender. Bitcoins are "mined" when the blockchain is updated by

"miners" who provide the computing power to "confirm" new Bitcoin transactions.  The Bitcoin program pays out a miner's fee in bitcoins for new transactions that are recorded on the blockchain, which is then updated for all Bitcoin users.

Bitcoin is a "convertible" virtual currency.  It has an equivalent value in fiat currency, acts as a substitute for fiat currency, and can be exchanged for fiat currency.  The exchange rate for Bitcoin is not determined by any authority or entity, for example, in the way that the Chinese yuan was once "pegged" at a certain rate to the United States dollar.  Rather, the value of the bitcoin is determined on the open market, with a "floating" exchange rate like many fiat currencies.  During the period charged in the Indictment, the equivalent value of a bitcoin in United States dollars fluctuated between approximately $5,013.91 and $3,809.70.

A bitcoin is "possessed," that is, control over it is exercised, by whoever possesses the corresponding private key that is necessary to transfer bitcoins at a public address.  Bitcoin users generally maintain these public-private key combinations in virtual "wallets."  These wallets are not limited to a single public address; a wallet's owner can change the public address with every transaction.  Therefore, no record of transactions associated with a particular wallet, and no pattern of transactions that may tend to identify the wallet's owner, can be readily gleaned from the blockchain alone.  This decentralized system for

maintaining bitcoins and Bitcoin transactions affords users less traceability and greater anonymity than traditional methods of transmitting money.

These characteristics have popularized the use of Bitcoin in certain contexts, including various Internet-based markets.  Vendors on a succession of "dark net" markets such as Silk Road, Agora, and AlphaBay Market offer a broad selection of goods and services.  Commerce on these markets is widely conducted through payment in virtual currencies; Bitcoin is a preferred and sometimes sole method of payment accepted on leading dark net markets.  Customers turn to Bitcoin exchangers to transfer funds from the physical world as fiat currency to the virtual world as bitcoins.  Vendors who receive payment in bitcoins also turn to Bitcoin exchangers to convert the bitcoins back to fiat currency.  In "selling" bitcoins to the customers, who pay the bitcoins to the vendors, who then "cash out" the bitcoins, these exchangers or series of exchangers effectively "recirculate" the virtual currency that makes this commerce flow.  Count Two of the Superseding Indictment charges the defendant for his conduct as a Bitcoin exchanger in this shadow financial system.

**IV.    Argument**

> **a.  <u>Congress wrote § 1960 to apply broadly, and for the term "funds" to include virtual currencies such as Bitcoin.</u>**

Green first argues that Section 1960 does not define virtual currency as "funds," and therefore the indictment "fails to state an offense."  <u>See</u> Dkt. 22. This argument fails based on the plain language of Section 1960 and a review of its legislative history, as numerous courts have now concluded.

### 1. The plain language of § 1960 defines "funds" broadly

"[T]he starting point for interpreting a statute is the language of the statute itself." United States v. Brown, 740 F.3d 145, 149 (3d Cir. 2014).  When words are not defined within the statute, we construe them "in accordance with [their] ordinary or natural meaning." Id.

Dictionaries in use when Congress enacted the statute containing an undefined term are appropriate to construe ordinary meaning.  See Taniguchi v. Kan Pac. Saipan, Ltd., 132 S. Ct. 1997, 2002 (2012)).

The meaning of a statutory term, "however, does not turn solely on dictionary definitions of its component words." Yates v. United States, 135 S. Ct. 1074, 1081 (2015).  "Because the meaning of language is inherently contextual," Moskal v. United States, 498 U.S. 103, 108 (1990), courts "interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose," and common sense.  Abramski v. United States, 573 U.S. 169, 179 (2014) (quotation omitted).  When caught between two possible definitions of a statutory term, one broader than the other in scope, a court looks to the statute's basic purpose and legislative history for guidance. See Muscarello v. United States, 524 U.S. 125, 132 (1998) (in interpreting 18 U.S.C. § 924(c), "conclud[ing] that neither the statute's basic purpose nor its legislative history support circumscribing the scope of the word 'carry' by applying an 'on the person' limitation").  For a statute that Congress clearly

intended to apply broadly, reading a term narrowly, and thereby narrowing the scope of the statute, would be a misinterpretation.  See id. at 132-33.

The plain text of § 1960 broadly defines "money transmitting" to "include[] transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  See § 1960(b)(2).  Although the statute does not define "funds," it provides that "funds" may be transferred by wire, check, draft, facsimile, or courier, among unlimited other means.  Thus, § 1960, on its face, makes clear that Congress intended no limitations on the form that funds may take, whether electronic, physical, or otherwise.  Nor does § 1960 express or imply any limitation, such as denomination in fiat currency, on the ordinary meaning of "funds."

Two authoritative dictionaries that were published around the time of the passage of the Act both support a broad understanding of "funds."  "The ordinary meaning of 'funds,' according to Webster's Dictionary, is 'available pecuniary resources,'" United States v. Murgio, 209 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) (quoting Webster's Third New International Dictionary 921 (2002)), "ordinarily including cash and negotiable paper that can be converted to cash at any time without loss."  Webster's Third New International Dictionary 921.  The same dictionary defines "pecuniary" as "taking the form of or consisting of money" and "money" as "something generally accepted as a medium of exchange, a measure

of value, or a means of payment." <u>Murgio</u>, 209 F. Supp. 3d at 707 (quoting Webster's Third New International Dictionary 1458, 1663).

Similarly, according to the American Heritage Dictionary, the primary definition of the noun "funds" (not simply as the plural form of the noun "fund") is "available money; ready cash." American Heritage Dictionary 712 (4th ed. 2000). The primary definition of "money" is, in turn, "[a] medium that can be exchanged for goods and services and is used as a measure of their values on the market, including among its forms a commodity such as gold, an officially issued coin or note, or a deposit in a checking account or other readily liquifiable [sic] account." <u>Id.</u> at 1135.

### 2. Federal courts have found consistently that Bitcoins constitute funds for purposes of § 1960

Relying on these broad definitions, courts have consistently concluded that Section 1960 applies not just to traditional currencies, but also to virtual currencies, including Bitcoin, because virtual currencies constitute "funds." Beginning in 2007, e-gold, an issuer of digital currency known as "e-gold," was charged with, *inter alia*, operating an unlicensed money transmitting business in violation of Section 1960(b)(1)(B). *See* <u>United States v. E-Gold, Ltd.</u>, 550 F. Supp. 2d at 82. The defendant in <u>E-Gold</u> sought to dismiss the charge on the ground that Section 1960 only reaches those who "deal in cash or currency." <u>Id.</u> The <u>E-Gold</u> court rejected that argument, finding that it was "clear" that the text of Section 1960 reached virtual currency, as the statute "defines 'money transmitting' broadly to include transferring 'funds,' not just currency, by 'any

and all means;' it is not limited to cash transactions." Id. at 88. In other words, under E-Gold's holding, "funds" includes not only traditional fiat currency, but also virtual currency, including both e-Gold and Bitcoin.

The court in Faiella reached the same conclusion in a Bitcoin prosecution under Section 1960 involving two defendants who operated a Bitcoin exchange on the Silk Road market.  39 F. Supp. 3d at 545.   The exchange received fiat currency from customers and transferred the funds as Bitcoin to the customers' Silk Road accounts for use on the market.  Id.  The Faiella Court concluded that "Bitcoin clearly qualifies as 'money' or 'funds' under [the] plain meaning definitions" of those terms, because "Bitcoin can be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions."  Id.

In United States v. Mansy, the court rejected defendant's argument that bitcoin was not "money" or "funds" with the meaning of § 1960 and "adopt[ed] the persuasive analysis of the majority of the district courts that have recently addressed this question."  Crim. No. 15-198, 2017 WL 9672554, at *1 (D. Me. May 11, 2017).   Courts that have considered other virtual currencies have likewise concluded that Congress intended § 1960 to capture, not ignore, similar means of wealth transfer.  See, e.g., United States v. Budovsky, Crim. No. 13-368, 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015) (finding the "Liberty Reserve" virtual currency to be "funds" for § 1960).

In <u>Murgio</u>, the Government alleged that the defendant operated and conspired to operate Coin.mx, a Bitcoin exchange, as an unlicensed money transmitting business in violation of federal and Florida law. 209 F. Supp. 3d at 704-05. The district court rejected the defendant's argument that Bitcoin is not covered by Florida's definition of "money transmitter" on the basis that it is not "currency, monetary value, or payment instruments" under Florida law. <u>Id.</u> at 712. In so doing, it reasoned that, because Bitcoin functions as a "medium of exchange, whether or not redeemable in currency," it falls within Florida's express definitions of "monetary value" and "payment instruments." <u>Id</u>. (explaining that "[b]ecause bitcoins are 'monetary value,' they are also 'payment instruments' "). <u>See also Sec. & Exch. Comm'n v. Shavers</u>, Civ. No. 13-416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) ("It is clear that Bitcoin can be used as money.")

Most recently, in <u>United States v. Stetkiw</u>, the court "adopt[ed] the reasoning in <u>Murgio</u> and <u>Faiella</u>, and cases relied on by them, and f[ound] that Bitcoin qualifies as 'money' and 'funds' under § 1960." Crim. No. 18-20579, 2019 WL 417404, at *2 (E.D. Mich. Feb. 1, 2019). In further holding that the defendant was operating a money transmitting business, the court found particularly compelling the fact that, like Green, "Stetkiw engaged as a business in the exchange of Bitcoin for real currency," and "allegedly charged a per-transaction commission/fee for the exchange and transfer of Bitcoin." <u>Id.</u> at *3.

In other contexts, courts have defined as "funds" instruments that extend beyond traditional concepts of currency—fiat, virtual, or otherwise.  In United States v. Day, for example, the Fourth Circuit interpreted the term "funds" in the context of Title 18, United States Code, Section 1956. 700 F.3d 713 (4th Cir. 2012).  The defendant in that case had conspired with another to convert his criminal proceeds to gold and covertly transport the gold to Mexico. Id. at 717-18.  He was convicted, among other things, of money laundering conspiracy.  Id. at 718.  On appeal, he challenged his conviction, arguing, similarly to Green, that gold does not qualify as either "funds" or "monetary instruments" within the meaning of Section 1956.  Id. at 723.  The Fourth Circuit disagreed.  Upon reviewing dictionary definitions of "funds," the court construed the term to refer to any "assets of monetary value that are susceptible to ready financial use."  Id. at 725.  Thus, it concluded that "gold can constitute 'funds' . . . where it is moved as a liquid, monetary asset."  Id. at 726.  The court noted that any other reading would lead to anomalous results at odds with the "purpose and structure of the money laundering statute," explaining:

> At its core, Day's argument is that a defendant can violate the transportation money laundering provision if he moves cash or some other ordinary financial instrument with a design to conceal its source, ownership, or other listed attribute, but not if he takes the further deceitful step of first converting the cash into the more difficult-to-trace financial asset of gold. To accept Day's argument would turn the transportation money laundering statute on its head, creating an odd safe harbor for criminals to transport

> and conceal their criminal proceeds where they engage
> in more deceit and concealment, not less. We do not
> think Congress could have intended such a result . . . .

Id.

The Fourth Circuit's holding in <u>Day</u> readily extends to virtual currencies such as Bitcoin.  As with gold, virtual currencies constitute "assets of monetary value that are susceptible to ready financial use."  <u>Day</u>, 700 F.2d at 726.  They can be purchased in exchange for ordinary currency and then used to conduct financial transactions.  Accordingly, they constitute "funds."  Indeed, the <u>Ulbricht</u> Court reached the same holding, explaining:

> Put simply, "funds" can be used to pay for things in the
> colloquial sense.  Bitcoins can be either used directly to
> pay for certain things or can act as a medium of
> exchange and be converted into a currency which can
> pay for things.  Indeed, the only value for Bitcoin lies in
> its ability to pay for things—it is digital and has no
> earthly form; it cannot be put on a shelf and looked at
> or collected in a nice display case.

2014 WL 3362059, at *24 (S.D.N.Y. Jul. 9, 2014).

### 3. The legislative history of § 1960 confirms that Bitcoins are "funds"

Green's construction of Section 1960 is also inconsistent with the statute's legislative history.  As set forth above, Congress passed Section 1960 as an anti-money laundering statute, based on a concern that criminals were turning increasingly to "nonbank financial institutions" to "convert street currency into monetary instruments" in order to transmit the proceeds of their crimes.  S. Rep. 101-460, 1990 WL 201710 (1990) (discussion of Title II).

Section 1960 was intended to address this "gaping hole in the money laundering deterrence effort."  Id.; see also Faiella, 39 F. Supp. 3d at 546 (finding that Section 1960's legislative history supports application of the statute to virtual currencies); Murgio, 209 F. Supp. 3d at 708 ("From its inception . . . , § 1960 sought to prevent innovative ways of transmitting money illicitly.").  Thus, the statute was meant to be flexible, to "keep pace with . . . evolving threats," such as that now posed by difficult-to-trace virtual currencies like Bitcoin.  Faiella, 39 F. Supp. 3d at 546.

Indeed, as recited supra at p.3, § 1960 and related statutes were amended by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, in part to address "informal banking systems, like the ancient South Asian money exchange system called hawala. . . [which] are exploited by terrorists and other financial criminals because of the lack of record-keeping and opportunity for anonymity."  H.R. Rep. No. 107-250, at 34.  The Second Circuit has explained the operation of a hawala as follows:

> The hawala system is widely used in Middle Eastern and South Asian countries, and is primarily used to make international funds transfers.  Though there are many forms of hawala, in the paradigmatic hawala system, funds are transferred from one country to another through a network of hawala brokers (i.e., "hawaladars"), with one hawaladar located in the transferor's country and one in the transferee's country.  In this form, a hawala works as follows: If Person A in Country A wants to send $1,000 to Person B in Country B, Person A contacts Hawaladar A in Country A and pays him $1,000.  Hawaladar A then contacts Hawaladar B in Country B and asks Hawaladar B to pay $1,000 in Country B currency, minus any fees, to

Person B. The effect of this transaction is that Person A has remitted $1,000 (minus any fees) to Person B, although no money has actually crossed the border between Country A and Country B.

Eventually, Hawaladar B may need to send money to Country A on behalf of a customer in Country B; he will then contact Hawaladar A, with whom he now has a credit due to the previous transaction. Hawaladar A will remit the money in Country A to the designated person there, thus clearing the debt between the two hawaladars. Typically, Hawaladar A and Hawaladar B would engage in many parallel transactions moving in both directions. A number of transactions might be required before the books are balanced between the two hawaladars. If after some period of time their ledgers remain imbalanced, the hawaladars may "settle" via wire transfer or another, more formal method of money transmission. The hawala system operates in large part on trust, since, as in the example above, a hawaladar will remit money well before he receives full payment, and he does so without the benefit of a more formal legal structure to protect his investment.

United States v. Banki, 685 F.3d 99, 103 (2d Cir. 2012).  One advantage of the hawala system, as noted in the House report, is the potential to anonymize the true sender and recipient of the funds being transferred.  See, e.g., United States v. Elfgeeh, 515 F.3d 100, 108-09 (2d Cir. 2008).  In enacting Section 1960, Congress sought to erase any doubt "that informal value transfer banking systems like hawalas are . . . covered by references to money transmitting businesses in certain provisions of existing law." H.R. Rep. No. 107-250, at 63-64.

Bitcoin is simply an evolved version of the above-described hawala. Bitcoin's implementation is different in that it has a single, integrated ledger that

needs not rely on trust between the operators to function.  For the customers, however, it provides nearly identical results.  In an analogous transaction to the Banki example, Person A goes to Exchanger A, instead of Hawaladar A.  Person A pays a quantity of currency to Exchanger A for Exchanger A to transfer the value of the currency as bitcoins to a Bitcoin address controlled by Person B (or to a Bitcoin address controlled by Person A for Person A to in turn transfer to an address controlled by Person B).  When Person B receives the transfer, Person B pays Exchanger B to receive the value of the bitcoins in whatever currency Person B wants.  Under § 1960, funds have been transferred from Person A to Person B, just as in a hawala.

Green's cramped reading of the statute would fail to effectuate its broad law enforcement purpose.  Today, virtual currency exchangers are among the "nonbank financial institutions" that pose significant money laundering risks.  "Congress designed the statute to keep pace with such evolving threats, which is precisely why it drafted the statute to apply to any business involved in transferring 'funds . . . by any and all means.'"  Faiella, 39 F. Supp. 3d at 546.  While Green notes that Congress enacted Section 1960 and amended it all "before the emergence of virtual currency or Bitcoin," that is beside the point.  Dkt. No. 22 at 6.  Congress sought to address a general problem susceptible to many variations.  It therefore used flexible language, capable of being adapted to ever-changing methods of moving money.  "[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not

demonstrate ambiguity.  It demonstrates breadth." <u>Pa. Dep't of Corr. v.</u>

<u>Yeskey</u>, 524 U.S. 206, 212 (1998) (internal quotation marks omitted); <u>see also</u>

<u>Barr v. United States</u>, 324 U.S. 83, 90 (1945) ("[I]f Congress has made a choice

of language which fairly brings a given situation within a statute, it is

unimportant that the particular application may not have been contemplated

by the legislators.").  That breadth plainly encompasses exchanges of value

involving virtual currency.

### b. <u>Section 1960 is not Unconstitutionally Vague and the Rule of Lenity does not Apply.</u>

Lacking any support in the statutory text or legislative history, Green

appeals to the doctrines of vagueness and the rule of lenity.  <u>See</u> Dkt. 22.  In

support of these arguments, Green invokes <u>United States v. Davis</u>, 139 S. Ct.

2319 (June 24, 2019), in which the Supreme Court invalidated the residual

clause of 18 U.S.C. § 924(c) on "fair notice" grounds—essentially, that the

Federal Courts cannot intrude on Congress's legislative authority by making

non-textual interpretations of broad and/or limited statutes.  But Green then

points out the crucial distinction between <u>Davis</u> and the instant case: the

separation of powers logic that animates <u>Davis</u> applies only when "the words

that Congress actually wrote are ambiguous or do not cover an area." Green

Br. at 8.  For all of the reasons set forth above, § 1960 is intentionally broad

but <u>un</u>ambiguous and applies to "<u>any and all means</u>" of exchanging value.

Green then attempts to invalidate the district court precedent articulated

above by observing that those cases predate <u>Davis</u>.  But the obligation of fair

notice long predates both <u>Davis</u> and the district court holdings above.  <u>See</u>
<u>Bouie v. City of Columbia</u>, 378 U.S. 347, 352 (1964).  And, importantly, so too
does the principle that Congress may enact a general prohibition and apply it
to specific circumstances.  <u>Id.</u>  For the below reasons, defendant's argument
regarding the application of <u>Davis</u> to the circumstances in this case falls short.

A penal statute is void for vagueness "only if it fails to provide people of
ordinary intelligence a reasonable opportunity to understand what conduct it
prohibits or authorizes . . . arbitrary and discriminatory enforcement."  <u>United</u>
<u>States v. Moyer</u>, 674 F.3d 192, 211 (3d Cir. 2012) (internal quotation marks
and citations omitted).  That principle "does not invalidate every statute which
a reviewing court believes could have been drafted with greater precision."
<u>Rose v. Locke</u>, 423 U.S. 48, 49 (1975).  In other words, "[a] statute need not
spell out every possible factual scenario with 'celestial precision' to avoid being
struck down on vagueness grounds."  <u>United States v. Hager</u>, 721 F.3d 167,
183 (4th Cir. 2013) (citation omitted).  Instead, constitutional vagueness
concerns "rest on . . . lack of notice, and hence may be overcome in any specific
case where reasonable persons would know that their conduct is at risk."
<u>Maynard v. Cartwright</u>, 486 U.S. 356, 361 (1988).  "Criminal statutes,
therefore, need only give fair warning that certain conduct is prohibited to
withstand a constitutional challenge."  <u>Moyer</u>, 674 F.3d at 211 (internal
quotation marks and citation omitted).

Furthermore, the type of facial statutory challenge that Green attempts here, including challenges based on vagueness, is disfavored.  The Supreme Court has held that "facial challenges . . . run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."  Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008) (internal quotation marks omitted).

Green's invocation of the principles of separation of powers and due process are misplaced.  Green cites to Davis for the proposition that Section 1960 "does not give people of common intelligence fair notice fair notice that transactions in Bitcoin violate [Section 1960]."  Dkt. No. 22 at 9.  But applying Section 1960 to a business engaged in the transfer of virtual currency hardly amounts to an "unforeseeable and retroactive expansion" of "narrow" statutory language.  Bouie, 378 U.S. at 352.   Rather, it is an utterly foreseeable application of expansive statutory language that has already been found to apply, repeatedly, in the virtual currency context.  See E-Gold, 550 F. Supp. 2d at 101 ("The Court imposes no novel construction upon Defendants.  Rather, it is Defendants' own novel construction of Section 1960 . . . that created the purported ambiguity giving rise to their motion to dismiss.").

The evidence shows that Green was well aware that anti-money laundering regulations applied to virtual currency and that he had reason to

conceal the sources of the funds he was exchanging into Bitcoin.  After all, when asked about the nature of his transactions with Gemini, Green explained, falsely, that he was trading his own funds, not his customers'.  <u>See Faiella</u>, 39 F. Supp. 3d at 547 (rejecting defendant's argument, on motion to dismiss, that applying Section 1960 to virtual currency business would constitute "ex post facto judicial lawmaking," particularly given allegations in the case that defendant was aware that the federal registration requirement applied to virtual currency businesses); <u>see also</u> <u>United States v. Pfeiffer</u>, 371 F.3d 430, 437 (8th Cir. 2004) (rejecting defendant's due process challenge to alleged vagueness of criminal statute, based in part on clear evidence in the record that defendant had "actual notice" that the statute covered his conduct).

Similarly, there is no irreconcilable ambiguity requiring resort to the rule of lenity here.  The rule of lenity, which requires that courts interpret criminal statutes in favor of defendants, applies only when there is a "grievous ambiguity or uncertainty" in the statute at issue.  <u>United States v. Salahuddin</u>, 765 F.3d 329, 340 (3d Cir. 2014) (<u>quoting Muscarello v. United States</u>, 524 U.S. 125, 139 (1998)).  The Supreme Court has repeatedly admonished that the rule of lenity is "reserved . . . for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute."  <u>Moskal v. United States</u>, 498 U.S. 103, 108 (1990) (quoting <u>Bifulco v. United States</u>, 447 U.S. 381, 387 (1980) (emphasis in original)).  "The doctrine is thus one of last

resort," United States v. Venturella, 391 F.3d 120, 133 (2d Cir. 2004) (citation and internal quotation marks omitted), and does not apply "merely because it [is] possible to articulate a construction more narrow than that urged by the Government," Moskal, 498 U.S. at 108.

Here, "[t]he words of the statute are clear; the applicable rules of statutory interpretation are clear; and the legislative history is clear.  A business is a money transmitting business if it transfers funds on behalf of the public by any and all means." E-Gold, 550 F. Supp. 2d at 100.  Green's conduct falls comfortably within these broad terms and directly implicates the legislative motivation underlying the statute.  The rule of lenity does not supply a basis for Green to graft a narrowing construction onto the statute at odds with its ordinary meaning and manifest purpose.  Id.; see also Faiella, 39 F. Supp. 3d at 546 (rejecting appeal to rule of lenity).

## V.    Conclusion

For the foregoing reasons, the Government respectfully submits that Green's motion to dismiss the indictment should be denied.

Respectfully Submitted,

CRAIG CARPENITO
United States Attorney

By:    _____
Anthony P. Torntore
Assistant U.S. Attorney

cc:   Michael Gilberti, Esq.